EAST TEXAS MOTOR FREIGHT LINES, INC., ET AL.
*v.* FROZEN FOOD EXPRESS ET AL.

NO. 162.

Argued March 7, 1956.—Decided April 23, 1956.

*David G. Macdonald* argued the cause for the East Texas Motor Freight Lines, Inc., et al., appellants in No. 162. With him on the brief were *Francis W. McInerny, Peter T. Beardsley, Clarence D. Todd* and *Dale C. Dillon.*

*Robert W. Ginnane* argued the cause for the Interstate Commerce Commission, appellant in No. 163. With him on the brief was *Leo H. Pou.*

*Charles P. Reynolds* and *Carl Helmetag, Jr.* submitted on brief for the Akron, Canton & Youngstown Railroad Co. et al., appellants in No. 164.

*Charles H. Weston* argued the cause for the United States and the Secretary of Agriculture, appellees. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Barnes, Robert L. Farrington, Neil Brooks* and *Donald A. Campbell.*

*Carl L. Phinney* argued the cause and filed a brief for Frozen Food Express, appellee.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Three motor common carriers filed a complaint with the Interstate Commerce Commission under § 204 (c) of Part II of the Interstate Commerce Act, 49 Stat. 547, as amended, 49 U. S. C. § 304 (c), alleging that Frozen Food Express, a common carrier by motor vehicle, was and had been transporting fresh and frozen meats and fresh and frozen dressed poultry in interstate commerce without a certificate of convenience and necessity from the Commission which covers those commodities. The complaint prayed for a cease and desist order. Frozen Food Express admitted that it was and had been so transporting the named commodities but asserted in defense that those operations were within the exemption of § 203 (b)(6).[1]

The Commission found that Frozen Food Express had been performing unauthorized operations and that fresh and frozen meats and fresh and frozen dressed poultry were not within the exemption of § 203 (b)(6). 62

___

[1] SEC. 203 (b) (6) provides:

"Nothing in this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include . . . motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish), or agricultural (including horticultural) commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation . . . ."

M. C. C. 646. Accordingly it ordered Frozen Food Express to cease and desist from engaging in these operations. Frozen Food Express brought suit before a three-judge District Court (28 U. S. C. § 2325) to set the Commission's order aside, 28 U. S. C. § 1336; 49 Stat. 550, as amended, 49 U. S. C. § 305 (g); 60 Stat. 243, 5 U. S. C. § 1009. The answer of the United States and the complaint in intervention filed by the Secretary of Agriculture supported the position of Frozen Food Express. The original complainants before the Commission and other interested carriers and carrier associations intervened in support of the Commission. The District Court sustained the Commission's conclusion that fresh and frozen meats are nonexempt commodities. No appeal was taken from that holding. The District Court held that fresh and frozen dressed poultry are exempt commodities under § 203 (b)(6) and restrained the Commission from enforcing its cease and desist order as respects those products. 128 F. Supp. 374. The cases are here by appeal. 28 U. S. C. §§ 1253, 2101 (b).

We agree with the District Court that the Commission's ruling does not square with the statute. The exemption of motor vehicles carrying "agricultural (including horticultural) commodities (not including manufactured products thereof)" was designed to preserve for the farmers the advantage of low-cost motor transportation. See especially 79 Cong. Rec. 12217. The victory in the Congress for the exemption was recognition that the price which the farmer obtains for his products is greatly affected by the cost of transporting them to the consuming market in their raw state or after they have become marketable by incidental processing.

The history of the words "agricultural . . . commodities (not including manufactured products thereof)" contained in § 203 (b)(6) supports that conclusion. The bill as it came to the floor of the House from the Interstate

and Foreign Commerce Committee (79 Cong. Rec. 12204) exempted "motor vehicles used exclusively in carrying livestock or unprocessed agricultural products." *Id.*, 12220. Mr. Pettengill for the Committee offered an amendment which substituted for the words "unprocessed agricultural products" the phrase "agricultural commodities not including manufactured products thereof." That amendment was agreed to after the following colloquy:

"Mr. PETTENGILL. Mr. Chairman, we have heard a good deal of discussion this afternoon as to what is a processed agricultural product, whether that would include pasteurized milk or ginned cotton. It was not the intent of the committee that it should include those products. Therefore, to meet the views of many Members we thought we would strike out the word 'unprocessed' and make it apply only to manufactured products.

. . . . .

"Mr. WHITTINGTON. In other words, under the amendment to the committee amendment, cotton in bales and cottonseed transported from the ginneries to the market or to a public warehouse would be exempt, whereas they might not be exempt if the language remained, because ginning is sometimes synonymous with processing.

"Mr. PETTENGILL. That is correct."

It is plain from this change that the exemption of "agricultural commodities" was considerably broadened by making clear that the exemption was lost not by incidental or preliminary processing but by manufacturing.[2] Killing, dressing, and freezing a chicken is certainly a

---

[2] Two more changes were made in the agricultural exemption clause before the bill reached final form. The words "fish, including shellfish," were added after the word "livestock" (79 Cong. Rec. 12220), and the exemption was strengthened by making it "absolute

change in the commodity. But it is no more drastic a change than the change which takes place in milk from pasteurizing, homogenizing, adding vitamin concentrates, standardizing, and bottling. Yet the Commission agrees that milk so processed is not a "manufactured" product, but falls within the meaning of the "agricultural" exemption. 52 M. C. C. 511, 551. The Commission also agrees that ginned cotton and cottonseed are exempt. *Id.*, 523–524. But there is hardly less difference between cotton in the field and cotton at the gin or in the bale or between cottonseed in the field and cottonseed at the gin, than between a chicken in the pen and one that is dressed. The ginned and baled cotton and the cottonseed, as well as the dressed chicken, have gone through a processing stage. But neither has been "manufactured" in the normal sense of the word. The Court in *Anheuser-Busch Assn.* v. *United States,* 207 U. S. 556, 562, in a case arising under the tariff laws, said,

> ". . . Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, as set forth and illustrated in *Hartranft* v. *Wiegmann,* 121 U. S. 609. There must be transformation; a new and different article must emerge, 'having a distinctive name, character or use.' "

rather than discretionary" with the Interstate Commerce Commission. *Id.,* at 12225–12226.

As originally enacted in 1935, § 203 (b) (6) exempted motor vehicles "used exclusively" in carrying agricultural commodities. In 1938 the word "exclusively" was deleted and the following language was added at the end of the clause: "if such motor vehicles are not used in carrying any other property, or passengers, for compensation." 52 Stat. 1237. In 1940 the word "ordinary" was inserted before the word "livestock," making the exemption applicable to "ordinary livestock." 54 Stat. 921. Finally, in 1952, the words "agricultural commodities" were broadened to "agricultural (including horticultural) commodities." 66 Stat. 479.

In that case imported corks were made ready for use in beer bottles by stamping, by removal of dust, meal, bugs, and worms, by washing and steaming to remove tannin and to increase elasticity, and by drying. Plainly, the corks were processed. But the Court held they had not been manufactured within the drawback provision of the tariff laws. And see *Hartranft* v. *Wiegmann,* 121 U. S. 609, 615; *United States* v. *Dudley,* 174 U. S. 670.

A chicken that has been killed and dressed is still a chicken. Removal of its feathers and entrails has made it ready for market. But we cannot conclude that this processing which merely makes the chicken marketable turns it into a "manufactured" commodity.[3]

At some point processing and manufacturing will merge. But where the commodity retains a continuing substantial identity through the processing stage we cannot say that it has been "manufactured" within the meaning of § 203 (b) (6).

The Commission is the expert in the field of transportation. And its judgment is entitled to great deference because of its familiarity with the conditions in the industry which it regulates. *American Trucking Assns.* v. *United States,* 344 U. S. 298, 310. But Congress has placed limits on its statutory powers; and our duty on judicial review is to determine those limits. See *Social Security Board* v. *Nierotko,* 327 U. S. 358. Those limits would be passed here if the Commission were permitted to expand "manufactured" to include such incidental processing as is involved in dressing and freezing a chicken.

*Affirmed.*

---

[3] The fact that most poultry is sold alive and is not killed and processed by the grower is not controlling. For § 203 (b) (6) exempts carriers transporting "agricultural commodities" unless those products are "manufactured." The exemption is concerned with the stage of the processing, not with the person who does it.

MR. JUSTICE BURTON, whom MR. JUSTICE FRANK-FURTER, MR. JUSTICE MINTON and MR. JUSTICE HARLAN join, dissenting.

For the reasons given by the Interstate Commerce Commission, 52 M. C. C. 511, 62 M. C. C. 646, and its administrative practice of over 15 years, I would sustain its interpretation of the Act to the effect that fresh and frozen dressed poultry, like fresh and frozen dressed meats, are not entitled to exemption as agricultural commodities. No appeal has been taken from that part of the judgment which held valid the Commission's determination that fresh and frozen dressed meats are products manufactured from agricultural commodities. The Commission's like treatment of poultry is not arbitrary or unreasonable. On the contrary, there was much evidence before the Commission which clearly supported its decision. Consequently, we should accord that decision the weight ordinarily given to informed administrative action. We cannot say that the order of the Commission, which held that there is no significant distinction between the two, is not an allowable judgment.

> "Such determinations [of fact by the Shipping Board or Interstate Commerce Commission as a basis for administrative orders] will not be set aside by courts if there is evidence to support them. Even though, upon a consideration of all the evidence, a court might reach a different conclusion, it is not authorized to substitute its own for the administrative judgment." *Swayne & Hoyt, Ltd.* v. *United States,* 300 U. S. 297, 304. See also, *Federal Communications Commission* v. *WOKO, Inc.,* 329 U. S. 223, 229; *United States* v. *Pierce Auto Freight Lines, Inc.,* 327 U. S. 515, 535–536; *Barrett Line, Inc.* v. *United States,* 326 U. S. 179, 199.