UNITED STATES of America,

v.

Sidney STEINSCHREIBER, doing business as Sidcaps Laboratories, John P. Calise, Westchester Blood Service, Inc., Harold H. Fisher, Kemworth Laboratories, Inc., and Norman Cappel, Defendants.

United States District Court
S. D. New York.

June 28, 1963.

As Clarified July 29, 1963.

See, also, 218 F.Supp. 426.

Robert M. Morgenthau, U. S. Atty., S. D. New York, by Albert J. Gaynor, and Richard A. Givens, Asst. U. S. Attys., of counsel, for the United States.

Abraham S. Robinson, New York City, for defendant Sidney Steinschreiber d/b/a Sidcaps Laboratories.

Morris Brettschneider, Brooklyn, for defendants John P. Calise and Westchester Blood Service, Inc.; Joel Brettschneider, Brooklyn, of counsel.

Maurice Edelbaum, New York City, for defendants Harold H. Fisher and Kemworth Laboratories, Inc.

E. Gayle McGuigan, New York City, for defendant Norman Cappel; Thomas D. McBridge, Philadelphia, Pa., of counsel.

TYLER, District Judge.

Trial of this indictment was had from April 8 to April 26, 1963, inclusive before this court without a jury.

Count 1 of the indictment charges all of the defendants with conspiracy to manufacture and prepare normal human blood plasma without a license issued by the Department of Health, Education and Welfare ("HEW")[1] and to carry, send and bring such plasma for sale from certain states into other states and foreign countries in violation of the provisions of 42 U.S.C. 262(a).

Counts 2 through 9 of the indictment charge defendant Sidney Steinschreiber with the substantive crimes of carrying, sending and bringing for sale in interstate and foreign commerce normal human blood plasma not manufactured and processed at an establishment holding a license issued by HEW as required by the aforesaid statute.

Counts 10 through 15 of the indictment charge the defendant Steinschreiber with the substantive crimes of false labeling of the containers of such blood plasma in violation of Subdivision (b) of 42 U.S.C. 262.

At the conclusion of the government's case on April 22, 1963, this court granted the motion of the defendant Dr. Norman Cappel for a directed acquittal. Similar motions of the other defendants were denied at the end of the government's case.

At the end of the entire case, this court directed an acquittal of the defendant Steinschreiber with regard to Count 9 alleged against him. The motions for directed acquittal of the defendant Steinschreiber and all other defendants at the close of the entire case are denied for reasons which will be discussed hereinafter. Further, this court concludes that the defendant Steinschreiber and defendants Calise, Westchester Blood Service, Inc. ("Westchester"), Fisher and Kemworth Laboratories, Inc. ("Kemworth") are guilty of the charge set forth in the conspiracy count, Count 1. Finally, this court concludes that the defendant Steinschreiber is guilty of the substantive charges alleged against him in Counts 2 through 8 and 10 through 15.

This opinion of the court incorporates the findings and conclusions of law in

---

1. More specifically, by HEW's National Institutes of Health ("NIH") which are the research arm of the Public Health Service.

reaching the dispositions hereinabove mentioned.

In addition, this opinion will treat and dispose of the various motions of the defendants to dismiss the indictment as against each of them for legal insufficiency.

## SUMMARY OF DEFENDANTS' OPERATIONS

In November, 1960, defendant Steinschreiber obtained an order from Lothar Zirker, President of Productexa Company, Inc., an export firm located at 15 Moore Street in New York City, for a quantity of units of dried normal human blood plasma. Steinschreiber agreed to furnish the units, which he knew were to be exported by Productexa; he also understood that such plasma was required to be "licensed by the NIH".

Steinschreiber then set about to obtain the requirements to fulfill this order. He spoke to Harold Goldman, an acquaintance and neighbor, and promised him a "commission" if Goldman could help him obtain the plasma. Goldman thereupon arranged to have Steinschreiber meet defendant John P. Calise of Westchester Blood Service, Inc., which at the time was primarily a distributor of whole-blood under a franchise from Community Blood & Plasma Service, Inc. ("Community"), a New York City-based "blood-bank". At the same time, Goldman worked out an arrangement with Calise whereby the latter would pay Goldman a "commission" on any orders obtained by Calise from Steinschreiber for liquid or dried plasma. In December, 1960, Goldman and Steinschreiber drove to the office of Westchester in New Rochelle. There Goldman introduced Steinschreiber to Calise. Steinschreiber informed the latter that he desired dried plasma for export. Calise stated that at the time he could only supply liquid plasma; however, he added that he was getting in equipment for drying plasma "in several weeks".

Later that month Calise and Steinschreiber met again, at which time the former informed the latter that he could not obtain the drying equipment. Steinschreiber replied that it would be necessary, therefore, to make other arrangements for drying. Calise agreed to supply the necessary liquid plasma. At the same meeting in New Rochelle, Steinschreiber used the telephone in Calise's office to call a number of university laboratories and pharmaceutical houses. Information gleaned by him from these calls led him to select a laboratory in New Jersey to effect the requisite drying of the liquid plasma which was to be supplied by Calise and Westchester.

Goldman then brought a Mr. Rudolph, a printer of labels, to Steinschreiber, and, pursuant to Steinschreiber's directions and approval, they drafted the label needed for the plasma packaging and an insert therefor. The label was designated that of "Sidcaps Laboratories", a firm name and style adopted by Steinschreiber, and bore NIH license number 224 issued by that government agency to Community. The labels were first delivered to Goldman and thereafter by him to Steinschreiber. They were paid for by check of Westchester signed by Calise as the principal officer of that company.

Next Goldman, at the request of Steinschreiber, went about ordering packaging, boxes, needles and other materials necessary for the complete packaging of units of dried plasma. These supplies were delivered to Westchester and paid for by checks of Westchester signed by Calise.

To provide the required quantities of plasma, all of the Westchester drivers were instructed by Calise to pick up expired[2] human blood from hospitals; for this "extra" service the drivers were to get a fee or commission. Calise also called up laboratory technicians and made arrangements to procure expired blood. When this blood was received at West-

---

**2.** Biologists and other qualified persons deem whole human blood given by a donor to have "expired" at the end of twenty-one (21) days—i. e. to have be- come sufficiently "stale" as to be unsafe for injection in the "whole" state into the bloodstream of a human patient.

chester, Calise aspirated[3] the liquid plasma from the expired blood and placed it in containers or bottles. The containers were then placed in a refrigerator where they remained until picked up by Steinschreiber or Goldman, or both.

The very first order of Productexa consisted of 100 "complete units" of dried plasma, which were actually purchased by Calise and Westchester from the Blood Bank Foundation, a firm located in Nashville, Tennessee. Late in December, 1960, Steinschreiber delivered these units, bearing Blood Bank Foundation labels, to Productexa in New York City.

During the third week of December, Goldman had met Steinschreiber at the offices of Westchester in New Rochelle where he helped Steinschreiber load liquid plasma, which had been secured by Westchester, into Steinschreiber's car.

Both men then drove to Kemworth Laboratories in New Jersey where Steinschreiber introduced Goldman to defendant Harold Fisher. At Kemworth, Goldman assisted in the work by putting metal caps on dried plasma bottles, labeling some of the bottles and placing the bottles in the original cartons. The liquid plasma was then dried at Kemworth. Goldman testified that while he was working, Steinschreiber and Fisher brought the dried plasma to him from the sterile room.

Goldman subsequently helped Steinschreiber load the dried plasma into Steinschreiber's car. From New Jersey they then drove to a store identified as a Westchester Blood Service depot located in Queens, New York. There Goldman, Steinschreiber and Steinschreiber's father and son worked, packaging complete units.[4] The following day Goldman and Steinschreiber delivered the cartons of completed units to Productexa, the exporter. This shipment contained 500 units of dried plasma bearing the label of

Sidcaps Laboratories. The exporter then gave the shipment to a local carrier which delivered it to Pan American Airlines at Idlewild Airport. Subsequently it was flown to Cuba.

Before the exporter would pay for the completed units, he demanded a letter verifying the NIH license number 224, which appeared on the containers. Thereupon, Steinschreiber obtained an undated "to whom it may concern" letter from Community. In substance, this was merely a statement that the plasma sold to Steinschreiber by Westchester was drawn from whole blood supplied by Community.

Mrs. Melanie Rosco, who was then Calise's secretary, testified that subsequently Steinschreiber came to Westchester's office and informed her that this Community letter was "not good enough" for the exporter. Accordingly, Steinschreiber dictated a letter to her and told her to sign the name of Calise. That letter was dated December 28, 1960 and "certified" that Community had been issued license number 224 covering the manufacture of normal, human plasma and that the plasma supplied under the Sidcaps label met all the requirements of the NIH.

The December 28 letter was accepted by Productexa, which thereupon paid Steinschreiber for the delivered units. Thereafter, Calise, Goldman and Steinschreiber exchanged checks representing their portions of the proceeds from Productexa. Fisher received a Westchester check signed by Calise for drying the liquid plasma.

During the months of January, February and March, 1961, Steinschreiber made many visits to Westchester. On some of these occasions he was accompanied by Goldman; on other occasions either he or Goldman went alone. Goldman testified that on most of these visits he

---

3. As commonly understood in the industry, to aspirate expired blood means in substance to draw off or separate from the red corpuscles the white liquid "plasma".

4. "Complete units" consisted essentially of an outer cardboard carton in which was contained a bottle of dried plasma, a bottle of sterile water, double ended, needles, plastic tubing and stopper diaphragm.

picked up liquid plasma. During this period, Goldman also, on several occasions, went to Kemworth and assisted Steinschreiber in taking dried plasma to Steinschreiber's home in Valley Stream, New York.

Further, with regard to the financial transactions of defendants Steinschreiber, Calise and Westchester, Mrs. Rosco identified two entries originally made by her in pencil, but later erased, in the Westchester ledger book. These entries originally read, "Calise—Stein—plasma $1,500.00" and, "Calise—Stein—plasma $3,000.00". Mrs. Rosco testified that later Calise told his accountant in her presence that these entries were to be erased and entered in ink, in each case, as "Loans pay—J.C.".

Further, regarding the role of Fisher and Kemworth, there is evidence that Steinschreiber informed Fisher that the dried plasma was for export. Mr. Francis Quinn, an employee of T. C. Wheaton Co., testified that containers for blood and saline solutions were ordered from his company via telephone by Westchester and that they were to be shipped to Kemworth Laboratories. These bottles were paid for by a check of Westchester signed by Calise.

Mrs. Winifred Mack, a former employee of Kemworth, testified that Steinschreiber visited Kemworth during the first three months of 1961. She said that Fisher directed her to put Sidcaps labels on bottles at Kemworth. She testified that, on several occasions, Steinschreiber's father would bring empty bottles, which, at instructions of Fisher, she washed and placed in the oven, the dials or controls of which would be set by Fisher. Mrs. Mack further testified that she put rubber caps on the dried plasma bottles.

Mrs. Margaret Giordano, another employee of Kemworth, testified that Steinschreiber brought liquid plasma to Kemworth during January and February, 1961, and that it was dried by Fisher personally.

I find, further, that Fisher allowed the facilities of Kemworth to be used by Steinschreiber over weekends for the filling of liquid plasma. Fisher received a check from Steinschreiber in February, 1961. Some time in February or March, 1961, Fisher discontinued drying of plasma for Steinschreiber.

In January, 1961, Steinschreiber delivered 1,860 completed units of dried plasma to Productexa. In February, 1961, Steinschreiber delivered two shipments of dried plasma personally to British Overseas Airlines Corp. ("BOAC") at Idlewild Airport, and on March 21, 1961 Steinschreiber delivered the final shipment to BOAC. These three shipments totaled 1,248 units.

On January 17 and 18, 1961 and on March 6, 1961, Steinschreiber purchased liquid plasma from Pioneer Blood Service, Inc. in New York City. Mr. Philip Carlinger, part-owner of Pioneer, testified that at the time Steinschreiber purchased the plasma, he informed Steinschreiber that the plasma was not useful as human plasma, to which Steinschreiber replied that it was to be used only for laboratory control products.

Subsequently, some of the plasma purchased from Pioneer was brought to Cappel Laboratories in West Chester, Pennsylvania, by Steinschreiber. Mr. Jerry Smith, an employee of Cappel Laboratories, testified that during early 1961, Cappel Laboratories attempted to dry liquid plasma for Steinschreiber. Smith said that Steinschreiber told him that the plasma was for export to Israel. Defendant Dr. Norman Cappel told Smith that Steinschreiber potentially had a large amount of plasma to be dried and that there could be a substantial dollar volume involved for Cappel Laboratories. Mr. Smith further testified that the plasma dried at Cappel Laboratories had to be discarded because it came out unsatisfactorily. Apparently for this reason, neither Dr. Cappel nor his firm ever billed Steinschreiber or received any payment for their services.

On March 13, 1961, Dr. Mealey and Dr. Tripp of the NIH interviewed defendant Calise and Mrs. Melanie Rosco at the Westchester office in New Rochelle,

and defendant Harold Fisher at Kemworth Laboratories, regarding shipments in commerce of liquid and dried blood plasma. The doctors obtained signed statements from both Calise and Fisher.

On March 16, 1961, Dr. Mealey and Dr. Tripp went to the Community office in New York City to ascertain the relationship between Westchester Blood Service and Community. On March 17, they returned to Community. In response to a telephone call from an officer of Community, Steinschreiber brought cartons of liquid and dried plasma units to Community. Mr. Calise was also present at the time. Steinschreiber was informed by Dr. Tripp that he needed a government license to manufacture and prepare plasma and export it. In response to his questions, Steinschreiber was told how and where he could obtain the requisite license. At the same time, the two government doctors explained to Steinschreiber that they had no power to seize his plasma but that if he would voluntarily turn it over to them, they would take it. Steinschreiber then wrote out in his hand a statement in which in substance he stated he was "voluntarily" delivering the plasma "for destruction". At the same time, Calise informed Steinschreiber, in Dr. Mealey's presence, that he would replace the plasma with licensed plasma from another firm.

Interestingly, this statement or delivery receipt executed by Steinschreiber in his own hand asserted that what he was voluntarily turning in was "the total amount (of plasma) that I have possessed". Notwithstanding this statement, four days later on March 21, Steinschreiber personally delivered four cartons of dried plasma to BOAC for export to Cuba. On March 24, 1961 Steinschreiber received from Productexa a check for $4,102.40 which was in payment for not only the five cartons of plasma delivered on March 21 but for others as well.

Mr. Zirker of Productexa testified that after March 24, 1961, he never heard from Steinschreiber again concerning plasma or any other matter.

## The Conspiracy (Count 1)

Although none of the defendants seriously dispute the essential outlines of the foregoing summary of their activities, each of them argues that he or his company was not involved in any conspiracy, that he or his firm had no knowledge that it was the intention to export the dried normal human plasma, that he or his company was totally unaware of any requirements of law for obtaining an NIH license, and that, in any event, there was every reason to suppose that license 224 issued to Community legitimately and adequately covered the steps taken to produce the plasma in question.

Defendants also argue that the nature of their operations as proved in this case was nothing more than the normal course of their business—that is to say, that they were merely buyers and sellers of products, or laboratory technicians, doing their normal commercial operations, and that such conduct cannot be said to constitute the crime of conspiracy.

There is ample evidence that neither Steinschreiber, Calise, Westchester, Fisher or Kemworth had ever been engaged in the manufacturing, processing, handling or selling of dried human plasma before the events of this case which commenced in or about November, 1961. In short, the record is clear that defendants' activities were by no means in the normal course of their business as it had theretofore been conducted. Finally, there is substantial evidence that each of the defendants (except for Cappel) was engaged in efforts to conceal and obfuscate the facts of their activities, once they became aware that representatives of HEW were alerted to at least some of their operations. See, concerning the relevance of such evidence, Direct Sales Co. v. United States, 319 U.S. 703, 63 S. Ct. 1265, 87 L.Ed. 1674 (1943); United States v. Campisi, 306 F.2d 308, 311 (2d Cir., 1962).

■ Turning now to the other arguments of defendants with regard to the conspiracy charge, this court takes as the governing proposition of law that

guilt is established if a defendant knowingly cooperated with another in causing a product covered by Section 262 of Title 42 to be manufactured and prepared, in whole or in part, at an establishment which did not have the required federal license, knowing that the product was for interstate or foreign shipment.

■ As will be discussed hereinafter, defendants vigorously contend that neither liquid nor dried normal human plasma is embraced by the provisions of this statute. Assuming arguendo at this point that such plasmas are within the ambit of Section 262, I find ample evidence that each of the defendants well knew that Steinschreiber had orders for plasma in the export trade, that he knew that no proper federal license had been issued to cover the processing and manufacturing in question and that he willingly cooperated in the scheme, hoping that it would succeed to his pecuniary gain.

Indeed, although such a higher standard of "knowledge" would not appear to be required as a matter of law, there is persuasive evidence that Steinschreiber, Calise and Fisher knew of the requirement of federal law, at least in general terms, that a license be obtained to cover the manufacture and preparation of dried plasma for sale in commerce.

Defendants also urge that the intendment and coverage of this criminal statute are unclear, except perhaps to biologists and persons similarly qualified, and that it follows, thus, that the necessary knowledge to establish any conspiracy is absent. This argument overlooks two points which are plain from the evidence. First, it is beyond dispute that both Calise and Fisher had been engaged in the pharmaceutical business and had therefore at least passing familiarity with human blood and its by-products; moreover, their normal business and professional duties were such as to make them peculiarly equipped to be aware of federal and state regulation in the field. As to Steinschreiber, it is plain that he made it a point to seek information and advice from universities and pharmaceutical houses concerning the drying of human plasma. Second, the elaborate machinations of Steinschreiber and Calise with regard to use of the Community license, Number 224, establish, among other things, their awareness that their activities were within the ambit of the very statute in question.

Regarding the defendant Fisher, there is in evidence a letter, dated during the time period of the alleged conspiracy, in which he stated that he knew of the existence of the statutory requirement of a federal license for manufacturing and preparing normal human plasma.[5]

It is the position of the defendant Calise that he knew of no conspiracy and, more particularly, that he was only a seller of liquid plasma to Steinschreiber. In effect, he argues that even if it be assumed that he knew that the ultimate product was to be sold in the export trade, he was only a seller with no knowledge of or intention to promote or cooperate in the conspiracy. Neither the direct evidence of the participation of Calise and Westchester, nor his ex post facto attempts to alter records, obfuscate the government investigation and the like, support this argument. I find that, beyond reasonable doubt, Calise made every effort to promote and cooperate in the conspiracy to manufacture and prepare without a license dried normal human plasma, with full knowledge not only that the ultimate product was to be sold in commerce but also that a federal license was required.

Defendants Fisher and Kemworth make a similar argument, except they point to facts tending to indicate that their role was only that of performing one service in the chain of events, to wit, that of effecting the drying process, and this for "experimental purposes". Unfortunately, the evidence indicates that, like Calise and Westchester, Fisher and Kemworth knew that the ultimate dried plasma units were to go in export, that Fisher and Kemworth had a definite

5. Gov. Ex. 137.

stake in making the enterprize succeed, that they realized at least some of the income which they contemplated from this venture and that their activities, limited in the comparative sense as they may be, came within the ambit of federal regulation. Fisher makes much of certain evidence indicating that he received only some $498.00 to accomplish a "drying run" for experimental purposes. Other evidence, however, suggests that this was an "after the fact" gambit designed to throw government investigators and the grand jury off the track. Actually, there is more than adequate proof that Fisher participated directly in the manufacturing and preparation of the units in question, that he knowingly participated in this criminal venture and that he received more than $498.00 as his share of its proceeds.

*The Unlawful Transportation Charges against Steinschreiber (Counts 2 through 8)*

Counts 2, 4, 6 and 8 of the indictment charge unlawful transportation of plasma by Steinschreiber from New Jersey to New York. About 498 units of dried normal human plasma of 250cc. size (Count 2) and about 1,860 units of such plasma of 50cc. size (Count 4) were dried by defendant Steinschreiber at Kemworth in Orange, New Jersey, and transported from there to the Borough of Manhattan and delivered there to Productexa at 15 Moore Street.

Similarly, the evidence shows that 1,248 units of dried plasma of 250cc. size were transported and delivered by Steinschreiber from Kemworth to BOAC at Idlewild Airport via a route through Manhattan in the Southern District of New York.

That each of these shipments was for sale in commerce is established by invoices in evidence.

With regard to the units of plasma charged in Count 8, it is found that not all of the plasma described therein was actually sent; however, the proof is clear that some 60 units were sent on the date alleged from New Jersey to Idlewild

through the Southern District of New York. Consequently, I hold that Count 8 has been substantially proved as against the defendant Steinschreiber. Cf., United States v. Steiner Plastics Mfg. Co., 231 F.2d 149, 152 (2d Cir., 1956).

Counts 3, 5 and 7 charged against Steinschreiber allege transportation for sale from New York to Cuba. With regard to Counts 3 and 5, it is found that Steinschreiber caused to be delivered on December 27, 1960 and January 11, 1961, respectively, 498 units of 250cc. size and 1,860 units of 50cc. size to Productexa in Manhattan for shipment to Cuba. Somewhat similarly, with regard to Count 7, it is determined that Steinschreiber caused the delivery of about 1,248 units of plasma of 250cc. size to BOAC as agents for Cubana. More particularly, I find that these units were sold, as in the case of all the others, to Productexa but actually delivered to BOAC for Productexa's account to be shipped to Cuba by Cubana.

Count 9 charges delivery by Steinschreiber for sale some 1,722 units of dried plasma to Productexa for shipment to Cuba. This count, however, was dismissed at the end of the government's case upon the ground of failure of proof.

*The Mislabeling Counts (Counts 10 through 15)*

A. Counts 10 through 12 charging False Labeling of License No. 224

In essence, these three counts charge Sidney Steinschreiber with unlawfully, willfully and knowingly mislabeling various units or packages of dried plasma with United States NIH License No. 224, whereas said units of plasma were not manufactured or prepared at establishments actually holding that license.

As heretofore indicated, license number 224 was actually issued by the government to Community. More important, it is uncontroverted that this was not a license to manufacture or prepare normal human plasma; rather, it was issued by the government to Community only

for the taking of whole blood from a qualified donor.

Among other things, Steinschreiber argues that he was honestly under the impression that license number 224 was meant to apply to manufacture and preparation of dry and liquid plasma. This explanation I find to be implausible, but even if it were to be credited, Steinschreiber could hardly have thought that a license issued to Community would embrace his activities and those of Calise, Westchester, Fisher and Kemworth Laboratories, as evidenced beyond reasonable doubt by the government's proof. Aside and apart from the fact that the regulations under the statute make it clear that each and every step of manufacturing and preparation must be conducted at establishments properly licensed, no man of reasonable intelligence could have assumed that a Community license number would cover the activities of Steinschreiber and others who had no direct relationship in this endeavor with the Community organization.

Further, the proof establishes that the labels in question were printed in the Southern District of New York and that the plasma shipments referred to in Counts 10 and 11 were physically delivered to the purchaser in this district.

Parenthetically, by the express language of Subdivision (b) of Section 262, interstate or foreign shipment of the mislabeled units of plasma is irrelevant and need not be proved. See United States v. Calise, 217 F.Supp. 705 (Cashin, J., S.D.N.Y.1963).

B. Counts 13 through 15 charging False Labeling as to Irradiation and Aging

The proof establishes that the labels on the units of plasma involved in these three counts contained a legend to the following effect:

"The plasma produced for *Sidcaps Laboratories* is protected by the methods recommended by the National Institutes of Health from the danger of transmission of serum hepatitis. It is irradiated by ultra-violet light to sterilize and to reduce the hazard of transmission of disease by the Plasma. * * * "

In essence, the government contends that the label legend quoted above was false in at least two significant respects:

(1) the plasma could not have been and was not aged for six months prior to drying, and

(2) the plasma was not irradiated properly and in accordance with adequate safeguards recommended by the NIH.

From the government's proof in this case, there can be little doubt but that the defendant Steinschreiber and his associates had no responsible concern about properly aging the liquid plasma. More particularly, it seems clear that liquid plasma, picked up largely through the efforts of Calise and his employees at Westchester, remained in the refrigerator at the Westchester laboratory no more than two or three weeks at the most before it was picked up for drying at Kemworth.

Similarly, I find ample evidence that the defendant Steinschreiber knowingly mislabeled the units in question in that he approved the legend to the effect that the plasma was irradiated in accordance with proper standards and methods recommended by the NIH. By his own admissions, the only irradiation done on the plasma in question was by means of drawing the liquid plasma through vicor tubing with an ultra-violet light under a hood. On the other hand, Drs. Ashworth, Brown and Strumia, expert witnesses called by the government, testified that this method was woefully inadequate and below NIH standards. In their opinion, the requisite method of irradiation would be by means of a machine applying or spreading an extremely thin film of liquid plasma directly under ultra-violet rays or light of sufficient intensity. Indeed, according to them, irradiation of plasma in the proper technical sense could only mean adherence to such a method or standard.

Moreover, the proof raises a powerful inference that Steinschreiber purpose-

fully did not adhere to any reasonably adequate standards in effecting irradiation in order to make a quick profit in connection with his agreed sales to Productexa for export.

## THE STATUTE—ITS COMPASS AND MEANING

■ The defense urges that Section 262 is inapplicable to their processing of blood plasma.[6] Specifically, they contend, within the terms employed by the statute, first, that dried human blood plasma is not "analogous" to a "therapeutic serum" and, second, that, in any event, the plasma was not "manufactured and prepared" by them. I will consider the application to the facts at bar of each of these two statutory phrases in turn.

Three highly qualified experts[7] in the field of biological science testified on behalf of the government, and each unequivocally expressed the opinion that, within the signification commonly understood in the industry, normal human blood plasma, whether liquid or dried, is "analogous" to a "therapeutic serum".[8]

Specifically, and in keeping with this conclusion, I find that human plasma and human serum are identical, in being the liquid portion of human blood, and that the only dissimilarity is that serum is plasma from which the fibrinogen, or clotting component, has been removed. [SM 1223]. As plasma is most frequently used, moreover, a substantial portion of the fibrinogen is in fact allowed to precipitate out before administration. [SM 1225, 1246]. For many therapeutic uses plasma and serum are interchangeable [SM 1230, 1373], and the same constituent elements which are significant in such therapeutic uses are present in both. [SM 1229, 1373].

The defendants, however, argue that since this court was constrained to take expert testimony on the issue whether Section 262 applies to the facts at bar, this constitutes at least a tacit admission that the statute, as here applied, is fatally ambiguous. But this statute is designed to regulate activity in a specialized field, or fields. Those who engage in such activity must, if such legislation as this is to be effective, be held to possess the specialized knowledge of biological terms which this court has endeavored to gain through the help of expert testimony. Moreover, there is persuasive evidence that the statutory references to biological terms which may not have been initially clear to this court were in fact clear to these defendants at the time of the offenses charged in this indictment.

The purpose and intended scope of the statute are indicated by the following language which was quoted approvingly in House Report No. 2713, 57th Cong., 1st Sess. (1902), p. 3, which recommended passage of this legislation:

"This bill seeks, as indicated by its title, to regulate the manufacture and sale of certain substances of animal origin which, except vaccine virus, have but recently come into general use for the prevention and cure of disease. The purity of these substances is of far more importance than is the purity of ordinary drugs because the former are ordinarily introduced into the circulation directly while the latter are introduced through the digestive tract."

This is an explicit statement of a legislative intent which is, in any event, easily inferrable from the statute itself. Such legislative intent clearly encompasses regulation of the manufacture and preparation of human blood plasma.

6. Neither counsel nor this court have discovered any opinion of another court construing this statute; indeed, this court is informed that no other criminal prosecution under this statute ever proceeded to trial.

7. The names of each, and pages of the minutes where their qualifications are set forth, are as follows: James N. Ashworth, SM 1170 ff.; Ivan W. Brown, SM 1212 ff.; Max W. Strumia, SM 1312 ff.

8. See, Ashworth, SM 1373 ff.; Brown, SM 1223 ff.; Strumia, SM 1318 ff.

■■ As an additional factor leading to the same conclusion, I note that the office of the Surgeon General, in regulations promulgated under the authority of 42 U.S.C. 262(d), has construed the subject language to include blood plasma. 42 C.F.R. § 73.1(i) (5) (ii). In noting this, I am also mindful that "[w]hile the interpretation given a statute by those charged with its application and enforcement is entitled to considerable weight, it hardly is conclusive." County of Marin v. United States, 356 U.S. 412, 78 S.Ct. 880, 2 L.Ed.2d 879 (1958), and that in a criminal prosecution it is particularly incumbent upon the court to exercise an independent judgment as to the scope and meaning of applicable statutory language. Cf., United States v. Standard Brewery, 251 U.S. 210, 219–220, 40 S.Ct. 139, 64 L.Ed. 229 (1920).

■ Turning next to the meaning of the phrase "manufactured and prepared", it first should be noted that the statute proscribes shipment in commerce of named products "unless * * * manufactured and prepared at an establishment holding an unsuspended and unrevoked license * * *". This means that where *any* significant phase or step of manufacturing and preparation has been done in an unlicensed establishment, this statute is not complied with.

■ The same three experts referred to above testified that, within the signification accepted in the industry, the drying of blood plasma, and activity incident to such drying, constitute the "manufacture" or "preparation" of a product.[9]

9. See Ashworth, SM 1369 ff.; Brown, SM 1234 ff.; Strumia, 1321 ff.
Defense reliance upon cases dealing with the meaning of the word "manufacture" in statutes very different from § 262 is misplaced. Their approach is blind, both to the context and purpose of § 262 as well as to the signification of the term in the particular industry involved. The defense, therefore, receives little assistance from the cases it cites, such as, *inter alia*, East Texas Motor Freight Lines, Inc. v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.

As stated by Judge Cashin in United States v. Calise, 217 F.Supp 705 (S.D. N.Y.1963):

"The word 'manufactured' as employed in this statute obviously was intended to include 'processing' within its signification. Unless the correct sanitary precautions were taken by the defendants, any processing of blood products by them could seriously imperil the health of patients. * * * *"

And, finally, it is helpful to note that, in regulations promulgated under the authority of Section 262(d), it is stated that:

" 'Manufacture' means all steps in the propagation or manufacture and preparation of products and includes but is not limited to filling, testing, labeling, packaging, and storage. * * * *" 42 C.F.R. 73.1 (v).

Accordingly, I conclude that the activity of the defendants in the processing and drying of liquid blood plasma and in performing steps necessary to prepare the dried plasma for ultimate use falls within the statute.

### CLAIM OF IMPROPERLY ADMITTED EVIDENCE

There remains one collateral but significant issue to be disposed of.

■ Defendant Steinschreiber asserts that certain material, consisting of quantities of dried plasma and liquid plasma (Government Exhibits 41 and 42, respectively), was improperly admitted into evidence. The uncontradicted tes-

Ed. 917 (1956) (Interstate Commerce Act, 49 U.S.C. 304(c), distinction between "agricultural * * * commodities" and "manufactured products thereof"); American Fruit Growers, Inc. v. Brogdex Co., 283 U.S. 1, 12, 51 S.Ct. 328, 330, 75 L.Ed. 801 (1931) (Patent Law, 35 U.S.C. 31, patentable "manufacture"); Anheuser-Busch Brewing Assoc. v. United States, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336 (1908) (Tariff Act, 26 Stat. 567, 617, rebate allowable for "articles manufactured * * * in the United States").

timony was that on March 17, 1961, Steinschreiber voluntarily surrendered this plasma to Dr. Tripp, as an agent of NIH. Steinschreiber contends that the surrender was made for the sole purpose of destruction of the plasma and that use of it as evidence in a criminal trial, being a use or purpose outside the conditions of surrender, would render the seizure unconstitutional.

Steinschreiber points to the brief written statement (Government Exhibit 45) which accompanied the surrender of the plasma, in which he stated, with reference to the dried plasma, that it was being turned over "for destruction by the National Institute (sic) of Health".

Not only, however, did Steinschreiber fail to move to suppress this evidence before trial,[10] but also the evidence was initially received without objection on his part. Steinschreiber's counsel, indeed, chose to emphasize at that point in the trial that the plasma had been turned over to Dr. Tripp voluntarily, and did not argue that the surrender was for a limited purpose only.[11]

But, passing the question as to whether Steinschreiber can raise the issue on the present state of the record, I find that Dr. Tripp, who was known by Steinschreiber as a representative of NIH, and who had informed Steinschreiber that the plasma in question was not properly licensed, did not, intentionally or unintentionally, induce the impression that this plasma would never be used as evidence in a criminal proceeding.[12] Hence, I conclude that the plasma was not obtained by any trickery or unfair inducement which would preclude its use as evidence in this trial.

## CONCLUSION

Upon the foregoing matters, it is directed that defendants appear for sentencing on the morning of August 2, 1963. Bail will be continued to abide the event.

10. Cf., F.R.Crim.P., Rule 41(e).

11. SM 257–258.