8 S.W.3d 316 (1999)
STATE of Texas, ex rel. DEPARTMENT OF CRIMINAL JUSTICE, Petitioner,
v.
VITAPRO FOODS, INC., Respondent.
No. 98-0645.
Supreme Court of Texas.
Argued April 8, 1999.
Decided December 9, 1999.
Rehearing Overruled January 27, 2000.
*319 Julia Lacy Armstrong, Gregory S. Coleman, John Cornyn, Jorge Vega, Ann Kraatz, David C. Mattax, Linda Eads, Meredith Bishop Parenti, Austin, for Petitioner.
P. Michael Jung, Dallas, for Respondent.
Justice ABBOTT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice OWEN, Justice BAKER, Justice HANKINSON and Justice O'NEILL join.
This case concerns whether the Texas Department of Criminal Justice ("TDCJ") had authority to enter into two contracts with VitaPro Foods, Inc., a private Canadian company that produces and markets a soy-based meat substitute under the trade name "VitaPro." On cross-motions for summary judgment, the trial court held that: (1) the contracts were invalid; (2) other than an initial completed purchase order contract, TDCJ had no obligation to VitaPro Foods to take or pay for any amount of VitaPro; and (3) TDCJ was without authority to pay for the VitaPro that had already been shipped under the disputed contracts. The court of appeals reversed and remanded for trial, holding that there was a fact issue whether VitaPro could be considered an "agricultural commodity" under the Direct Purchasing Statute, which TDCJ relied on in directly contracting for the VitaPro. 969 S.W.2d 84. We hold that VitaPro is not an agricultural commodity as a matter of law and that no statutory provision authorized TDCJ to enter into these contracts. Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's judgment.

I
TDCJ is divided into several divisions. See TEX. GOV'T CODE § 493.002(a). Among these, the Institutional Division is charged with operating and managing the state prison system. See id. § 493.004. The Institutional Division is itself divided into numerous departments, including Food Services, which purchases food and prepares meals for prison inmates, and Texas Correctional Industries ("TCI"), an inmate labor program designed both to rehabilitate inmates by providing vocational training and to defray the costs of housing *320 inmates by using inmate labor. See id. § 497.002.
In early 1994, TDCJ officials began discussions with VitaPro Foods representatives, which culminated in TDCJ's first purchase of VitaPro. According to the summary judgment evidence, TDCJ's Executive Director, James Collins, instructed TDCJ's Food Services Director to prepare a bid specification to acquire VitaPro for testing purposes. The Food Services Director submitted the bid to the General Services Commission ("GSC"), which is the central purchasing agency established by the Legislature to purchase "all goods and services for a state agency." Id. § 2155.061. The GSC acquired this initial VitaPro for TDCJ's testing purposes.
Following the testing, Yank Barry, president and CEO of VitaPro Foods at the time of these transactions, met with TDCJ and TCI officials to discuss having TCI repackage and market VitaPro to other state agencies and out-of-state prison systems. VitaPro Foods and TCI talked about forming a distributorship arrangement whereby TCI would purchase VitaPro in bulk at a reduced cost, repackage the product using inmate labor, and resell it at a higher price. After several months of discussions with VitaPro Foods, TCI officials developed an "action plan" that called for TCI to repackage and resell VitaPro both to Food Services for inmate consumption and to tax-supported entities in other states. As part of this plan, TCI developed a purchase order for VitaPro, designed an FDA-compliant label for the repackaged VitaPro, procured a repackaging license from the Texas Department of Health, and conducted research to confirm TCI's belief that it had statutory authority to directly purchase VitaPro. The plan also expressed the desire for TCI to eventually produce VitaPro as one of its prison-industries programs.
Between July 1994 and September 1995, a series of five purchase orders was issued to VitaPro Foods. These purchase orders also served as the contracts between the parties. The first purchase, which was made through the GSC for TDCJ's testing purposes, is not in dispute in this case. Without going through the GSC, TDCJ issued four succeeding purchase orders under the purported authority of the Direct Purchasing Statute. See Act of May 11, 1989, 71st Leg., R.S., ch. 212, § 2.01, sec. 495.051, 1989 Tex. Gen. Laws 918, 931, amended by Act of Mar. 25, 1991, 72d Leg., R.S., ch.16, § 10.01(a), sec. 496.051, 1991 Tex. Gen. Laws 244, 284, repealed by Act of May 28, 1997, 75th Leg., R.S., ch. 1409, § 9, 1997 Tex. Gen. Laws 5278, 5284. This statute provided an exception to the GSC bidding requirements and allowed TDCJ to buy certain goods directly from third parties. The first two of the four purchase orders were superseded by the two purchase orders in dispute here.
TDCJ issued the first disputed purchase order on November 7, 1994, accompanied by a formal "Decision Memorandum," wherein TDCJ's Executive Director stated that "[i]t is the intent of [TCI] to purchase Dehydrated Textured Protein Product (TVP) in bulk quantities, and using inmate labor, repackage and label said product in commercial containers for sale to the TDCJ-ID Food Service Facilities and to the correctional facilities of other states. We feel that this enterprise is both economically feasible and advantageous to the Texas Department of Criminal Justice-Institutional Division pursuant to the provisions of Art. 6203c-12 V.A.C.S." Texas Revised Civil Statute article 6203c-12, subsequently codified as Texas Government Code section 496.051(b) (repealed 1997), was known as the Direct Purchasing Statute. The first purchase order obligated TDCJ to purchase a minimum of seventeen metric tons of VitaPro per month for a term ending August 31, 1995, with the option to renew the contract for four additional one-year terms. In July 1995, TDCJ issued the second purchase order. This purchase order had a five-year term and obligated TDCJ to purchase at least thirty-nine *321 metric tons of VitaPro per month. The estimated cost of the VitaPro under both purchase orders was over $40 million. Both disputed purchase orders stated that the "purchase is exempted from review and approval by the GSC" as provided in the Direct Purchasing Statute. Neither purchase order specifically referred to the distributorship plan, but both contained an allusive reference to the plan by requiring VitaPro Foods to "[p]rovide [TCI] technical assistance in areas such as product packaging and inventory control."
All shipments of VitaPro were delivered directly to TCI, who repackaged the product using inmate labor. TCI also began marketing VitaPro. A "VitaPro Marketing and Training Team" was formed, and, during the first half of 1995, sales and demonstration visits were made to correctional facilities and other state facilities in California, Iowa, Maryland, Nebraska, New York, Pennsylvania, and Texas. Marketing materials were sent to officials in twenty-two other states. These efforts met with limited success. TCI completed only five sales to other entities, including New York, Iowa, Missouri, Nacogdoches County, Texas, and McLennan County, Texas, which totaled $84,719.11. Moreover, the VitaPro sold to New York and Iowa was shipped directly from VitaPro Foods in Canada because of lower shipping costs, which yielded TCI a sales commission without TCI ever handling the VitaPro. As a result, almost all of the VitaPro actually sent to TCI was repackaged and then shipped to Food Services.
In addition to suffering from a lack of outside interest, VitaPro did not fare well with the TDCJ staff or inmates. In its motion for summary judgment, TDCJ presented evidence that the frequent serving of VitaPro demoralized the staff and inmates and led to adverse health effects, including rampant flatulence. Because of frequent complaints, TDCJ stopped accepting shipments of VitaPro in February 1996 and phased out serving it to the inmates and staff from February to May 1996.
TDCJ filed this declaratory judgment action on February 20, 1996, and requested, among other things, the court to declare that no contract had ever been formed between TDCJ and VitaPro Foods. VitaPro Foods counterclaimed and requested the court to declare that the contract was valid and that VitaPro Foods was due damages for breach of contract. TDCJ filed a motion for summary judgment on the grounds that: (1) other than the original purchase order placed by the GSC for TDCJ's testing purposes, no contract was ever formed between TDCJ and VitaPro Foods; (2) other than the original purchase order, which had already been fully performed by both parties, TDCJ was under no obligation to take or pay for any amount of VitaPro; and (3) TDCJ was without authority to expend the funds used to pay VitaPro Foods for the goods shipped under the two disputed contracts. VitaPro Foods filed a cross-motion for summary judgment seeking a declaration that the contracts were valid and that TDCJ's claims regarding the contracts being invalid or canceled for cause were without merit.[1]
The trial court granted TDCJ's motion and denied VitaPro Foods's motion, declaring that the two disputed contracts were invalid, that TDCJ had no obligation to VitaPro other than the initial purchase order obtained through the GSC, and that TDCJ was without authority to pay for the goods shipped under the disputed contracts. The court of appeals reversed and held that a genuine issue of material fact *322 existed as to whether VitaPro was an agricultural commodity under the Direct Purchasing Statute. We disagree and hold that no part of the Direct Purchasing Statute applies in this case as a matter of law and that no other statute relied on by VitaPro Foods provided TDCJ with authority to bypass the GSC and directly purchase VitaPro.

II
In general, only persons authorized by the Constitution or a statute can make a contract binding on the State. See State v. Ragland Clinic-Hosp., 138 Tex. 393, 159 S.W.2d 105, 106 (1942). All state officers' powers are fixed by law, and all persons dealing with them are charged with notice of the limitations on those powers. See id. at 107. Only persons having actual authority to act on behalf of the State can bind the State in contract. See id. The primary issue in this case is whether TDCJ, an agency of the State, had actual authority to bind the State by directly issuing purchase orders to VitaPro Foods.
The Texas Government Code establishes a comprehensive regime for state purchasing, the foundation of which is section 2155.061(a).[2] This section, which requires state agencies to make purchases through the GSC unless an exception applies, is designed to promote cost-effectiveness by requiring vendors to compete for state contracts. At the time TDCJ issued the disputed purchase orders, the Texas Government Code contained such an exceptionthe Direct Purchasing Statute. This statute, which applied to TDCJ, stated:
The [TDCJ] board may authorize the executive director to adopt policies allowing the institutional division to purchase directly or at public auction livestock, agricultural commodities, agricultural or industrial equipment, supplies, and raw materials for agricultural or industrial production, breeding, consumption, or resale, if the division determines that the purchase is economically feasible and advantageous to the division. The State Purchasing and General Services Act ... does not apply to purchases made under this subsection....
Act of May 11, 1989, 71st Leg., R.S., ch. 212, § 2.01, sec. 495.051, 1989 Tex. Gen. Laws 918, 931, amended by Act of Mar. 25, 1991, 72d Leg., R.S., ch.16, § 10.01(a), sec. 496.051, 1991 Tex. Gen. Laws 244, 284 (repealed 1997). VitaPro Foods contends that this provision authorized TDCJ to contract directly with VitaPro Foods instead of contracting through the GSC.
Under the statute's plain language, TDCJ was given the authority to contract directly for agricultural commodities, agricultural or industrial equipment, supplies, and raw materials to be used for agricultural or industrial production, breeding, consumption, or resale. See id. In its summary judgment motion, VitaPro Foods asserted that VitaPro is an agricultural commodity, raw material, or supply as a matter of law. The court of appeals analyzed but did not decide whether "agricultural or industrial," as used in the first part of the Direct Purchasing Statute, modifies the words "supplies" and "raw materials." We conclude that it does. The court of appeals held that a fact issue existed whether VitaPro was an agricultural commodity, concluded that VitaPro had undergone too much processing to be classified as a raw material, and did not address whether VitaPro could be considered an agricultural or industrial supply. We hold that VitaPro is not an agricultural commodity, an agricultural or industrial raw material, or an agricultural or industrial supply as a matter of law.

*323 A
VitaPro Foods contends that VitaPro is an agricultural commodity under the Direct Purchasing Statute. We agree with a federal court's conclusion that, when the facts are undisputed, whether something is an agricultural commodity is a question of law. See Gold Kist, Inc. v. United States, 339 F.Supp. 1249, 1255 & n. 6 (N.D.Ga.1971) (deciding as a matter of law that a cooked poultry product is an agricultural commodity under the Interstate Commerce Act, 49 U.S.C. § 303(b)(6)), aff'd sub nom. Interstate Commerce Comm'n v. Gold Kist, Inc., 409 U.S. 808, 93 S.Ct. 106, 34 L.Ed.2d 67 (1972). "Agricultural commodity" is not defined by either the Direct Purchasing Statute or Texas common law. The term is defined in the Texas Agriculture Code as "a fruit or vegetable ... whether it is in its natural condition or has been processed." TEX. AGRIC. CODE § 104.002. But, this definition does not delineate what degree of processing a product can undergo and still retain its original character as an agricultural commodity.
To determine how much processing the soybeans could go through and still retain their original character as an agricultural commodity, the court of appeals looked to the substantial identity test developed for interstate commerce law in East Texas Motor Freight Lines, Inc. v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917 (1956). This test acknowledges that many agricultural commodities undergo some degree of processing, but the test focuses on the "point [at which] processing and manufacturing ... merge" and a new and different item is created. See id. at 54, 76 S.Ct. 574. As long as "the commodity retains a continuing substantial identity through the processing stage," it remains an agricultural commodity. Id.
Although this Court is not bound to apply the substantial identity test in this case, we are inclined to adopt it because it provides a reasonably clear test with a history of application by other courts. For example, courts applying the substantial identity test have concluded that agricultural commodities include, among other things, frozen and dressed poultry, fresh-cut vegetables in cellophane bags, shelled peanuts, pasteurized milk, and mechanically or artificially dried fruits. See, e.g., Interstate Commerce Comm'n v. Schaetzel, 339 F.Supp. 1345, 1346-47 (E.D.Wis.1972); Frozen Food Express v. United States, 148 F.Supp. 399, 402-03 (S.D.Tex.1956). Things held not to be agricultural commodities include nonfat dried milk when certain ingredients have been added, cottage cheese, cream cheese, butter, canned fruits and vegetables, and condensed milk. See Schaetzel, 339 F.Supp. at 1346-47; Frozen Food Express, 148 F.Supp. at 402-03. Although the court of appeals chose the proper test to determine if VitaPro is an agricultural commodity, the court misapplied the test in concluding that a fact issue exists regarding whether VitaPro is an agricultural commodity.
TDCJ contends, and we agree, that VitaPro is not an agricultural commodity under the substantial identity test because it is a highly manufactured and finished product. The procedure for making VitaPro substantially transforms the original soybeans by extracting the vegetable protein component from the beans, texturizing it, and adding various flavorings, dehydrated vegetables, and other food additives, such as modified food starch and anti-caking agents. VitaPro may be soybean-based, but after being heavily processed, its finished form is a new and different article "having a distinctive name, character or use." See East Texas Motor, 351 U.S. at 53, 76 S.Ct. 574 (citing Anheuser-Busch Brewing Ass'n v. United States, 207 U.S. 556, 562, 28 S.Ct. 204, 52 L.Ed. 336 (1908)). The substantial identity of VitaPro's core ingredientsoybeansis not retained after going through such a significant re-engineering process. Instead, the original soybeans are transformed into texturized vegetable protein, *324 which is a product with a new and distinctive name and a new and different character. Therefore, under the substantial identity test, VitaPro is not an agricultural commodity as a matter of law.

B
VitaPro Foods also argues that VitaPro should be considered a raw material or a supply under the Direct Purchasing Statute. The Direct Purchasing Statute does not define either term. Both parties agree, however, that the proper inquiry when determining if something is a raw material is the product's relationship to its ultimate state as opposed to its relationship to its original state; in other words, a raw material is "raw" if it will be subsequently converted into a new product. The summary judgment evidence shows that TCI repackaged the VitaPro but did not convert it into a new product. Although TCI documents referred to VitaPro in bulk form as "raw material" and to VitaPro in its repackaged form as "finished goods," these descriptions are not dispositive of VitaPro's character. TCI made no alteration to the product itself. The VitaPro delivered to TCI had already been packaged by the manufacturer; all TCI did was remove that packaging and replace it with its own packaging. This repackaging was not related to the manufacturing process and did not convert the VitaPro that was delivered to TCI into a new product. Therefore, VitaPro is not an agricultural or industrial raw material under the Direct Purchasing Statute.
Similarly, VitaPro cannot be categorized as an agricultural or industrial supply. Because the Direct Purchasing Statute does not define "agricultural or industrial supply," VitaPro Foods urges that we borrow a definition from Texas Revised Civil Statute article 5069-16.05, which was part of the Business Opportunity Act at the time relevant to this case.[3] Under that definition, "supplies" include "any and all materials used to produce, grow, breed, or make any product or item." TEX.REV.CIV. STAT. ART. 5069-16.05. Although the Business Opportunity Act is not pertinent to this case, we agree with VitaPro Foods that the definition of "supply" included within the Act provides a useful definition to help determine VitaPro's character. Accordingly, we define "agricultural or industrial supply," as it is used in the Direct Purchasing Statute, to mean any and all materials used to produce, grow, breed, or make any agricultural or industrial product or item. Under this definition, VitaPro cannot be a supply because the product itself was not used to make another productVitaPro itself was not used to produce, grow, breed, or make anything. Therefore, VitaPro is not an agricultural or industrial supply under the Direct Purchasing Statute.

III
VitaPro Foods also contends that the direct purchases were authorized under either of two statutory exceptions to the competitive bidding process found in Texas Government Code section 2155.141. That section provides that the GSC does not have authority to purchase goods and services for resale or for an auxiliary enterprise. See TEX. GOV'T Code § 2155.141. Although section 2155.141 excepts these types of transactions from the GSC's authority to make purchases, it does not expressly confer direct contracting authority to some other state agency such as TDCJ. The authority to purchase goods or services must first be found in another statute, and then, if the purpose of the purchase falls under one of section 2155.141's exceptions, the agency could purchase the goods or services without going through the GSC. Therefore, we *325 must determine the threshold issue of whether TDCJ had statutory authority to issue the purchase orders.
VitaPro Foods submits that any one of three statutes provided TCI (and thus TDCJ) with authority to issue these purchase orders. The three statutes VitaPro Foods relies on are found in Texas Government Code Chapter 497. This chapter defines TCI, known as the "prison industries office," and the purposes behind establishing it as an office of TDCJ. See id. §§ 497.001-.002. VitaPro Foods argues that sections 497.005, 497.006, and 497.025 authorized the purchase orders in this case.[4]
At the time TDCJ issued the purchase orders, section 497.005 provided that "[p]roceeds received from the operation of a prison industries program shall be deposited in the industrial revolving fund. The proceeds may be used by the department for the administration of this subchapter." Id. § 497.005. Nothing in section 497.005 itself, however, provided TDCJ or TCI with contracting or purchasing authority. The language of section 497.005 merely indicated that TCI was allowed to use the proceeds from prison-industries programs to assist with the administration of the prison-industries office; in other words, section 497.005 provided that TCI could use proceeds from prison-industries programs to pay for goods and services contracted for under the authority found in a different section in Chapter 497section 497.006that allowed TCI to enter into certain types of contracts related to the prison-industries program. See id. §§ 497.005-.006. Although section 497.005 allowed TCI to use the proceeds from prison-industries sales to pay for goods or services obtained through these contracts, that section did not provide an independent basis for TCI to contract directly with VitaPro Foods.
The second statute VitaPro Foods relies on is section 497.006, which stated: "To encourage the development and expansion of the prison industries program, the prison industries office may enter into necessary contracts related to the prison industries program. With the approval of the board, the office may enter into a contract with a private business to conduct a program on or off property operated by the department." Id. § 497.006. Although section 497.006 stated that TCI "may enter into necessary contracts related to the prison industries program," the statute also specifically required board approval before TCI could enter into a contract with a private business such as VitaPro. See id. Both parties agree that there was no board approval of the purchase orders in this case.
VitaPro Foods suggests that the two sentences in section 497.006 should be read separately, such that TCI could enter into necessary contracts related to the prison-industries program without first obtaining board approval. It is not necessary, however, to determine whether VitaPro Foods's interpretation is correct. The second sentence of section 497.006 governed the purchase orders in this case, because VitaPro Foods is a private business with whom TDCJ contracted to conduct a prison-industries program. Because there was no board approval of these contracts, section 497.006 did not provide authority for the VitaPro purchases.
Finally, VitaPro Foods contends that section 497.025 enabled TCI to purchase goods such as VitaPro. This section stated: "To provide articles and products to an agency of the state or a political subdivision of the state, the institutional division may purchase equipment, raw materials, and supplies in the manner provided by law." Id. § 497.025 (emphasis *326 added). Clearly, this provision did not independently grant authority to enter into the contracts with VitaPro. Instead, the statutory language made clear that the purchase of certain materials under section 497.025 could only be made "in the manner provided by law." Thus, for this section to apply, VitaPro Foods must point to some other law that would have enabled TCI to circumvent the GSC and purchase the VitaPro directly.
VitaPro Foods claims that the VitaPro purchases satisfied section 497.025's mandate that purchases be made "in the manner provided by law" because section 2155.141 excepted certain purchases from the GSC's authority and thus provided a statutory basis under which the purchases could be made. This analysis is circular, however, because even if the purchases were made for an excepted purpose, such as for resale, that did not, ipso facto, provide TDCJ with authority to enter into the contracts directly. Under section 2155.141, a separate statute must have provided TDCJ with authority to make the purchases in the first place. As noted, section 497.025 did not provide direct contracting authority because it only allowed purchases in the manner provided by law. It is circular to argue that "in the manner provided by law" included purchases made for resale under the exception in section 2155.141 when that exception itself required independent purchasing authority.

* * * * *
We conclude that TDCJ did not have authority to contract directly with VitaPro Foods under the Direct Purchasing Statute, and no other statute provided TDCJ with the authority to issue the purchase orders to VitaPro Foods. Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's judgment.
Justice GONZALES did not participate in the decision.
NOTES
[1] TDCJ retained the right to cancel the second purchase order for cause, defined by the purchase order as "serious detriment to the daily operations of TDCJ-ID." TDCJ raised this issue in the trial court as an alternative ground for canceling that contract and also requested the court to rescind the contract under the doctrine of equitable recission. Neither alternative ground, however, has been raised by TDCJ here as a ground for cancellation.
[2] "The commission shall acquire by purchase, lease, rental, or another manner all goods and services for a state agency, including a purchase that does not require a competitive bid or a spot purchase." TEX. GOV'T CODE § 2155.061(a).
[3] The Business Opportunity Act was repealed in 1997 and the Finance Code was adopted in its place. Act of June 1, 1981, 67 th Leg., R.S., ch. 682, § 1, 1981 Tex. Gen. Laws 2555, 2555, repealed by Act of May 22, 1997, 75th Leg., R.S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3601.
[4] These three sections have all been amended since the time these contracts were made. We express no opinion as to the validity of the contracts under any subsequent versions of these statutes. Our opinion in this case is based on the versions of the statutes in effect at the time the parties entered into these contracts.