**AERO TRUCKING, INC., Plaintiff,**

v.

**UNITED STATES of America**

**and**

**Interstate Commerce Commission, Defendants.**

**Civ. A. No. 65–413.**

United States District Court, W. D. Pennsylvania.

Jan. 11, 1966.

Royston, Robb, Leonard, Edgecombe & Miller, Pittsburgh, Pa., George, Greek, King & McMahon, Columbus, Ohio, John A. Vuono, Pittsburgh, Pa., McInnis, Wilson, Munson & Woods, Washington, D. C., for plaintiff.

Gustave Diamond, U. S. Atty., Pittsburgh, Pa., Donald F. Turner, Asst. Atty. Gen., Anti-Trust Div., John H. D. Wigger, Atty., Dept. of Justice, Robert W. Ginnane, Gen. Counsel, Leonard S. Goodman, Asst. Gen. Counsel, I.C.C., Washington, D. C., for defendants.

Before STALEY, Circuit Judge, and MILLER and WEBER, District Judges.

## OPINION

WEBER, District Judge.

This is an action to enjoin, set aside, annul and suspend in its entirety, an Order of the Interstate Commerce Commission directed against plaintiff in the proceedings designated as Aero Trucking, Inc., Extension-Aluminum, Docket No. MC–60014 (Sub No. 10), reported at 99 M.C.C. 272, dated October 29, 1964. This action is brought in this Court under and pursuant to the provisions of Title 28 U.S.C. § 1336, 1398, 2284, 2321–2325, and of Title 5 U.S.C. § 1009.

Plaintiff, an Ohio corporation, with principal offices in Oakdale, Pennsylvania, is a common carrier holding certificate of Public Convenience and Necessity No. MC–60014, which authorized the transportation of commodities which, by reason of their size or weight, require the use of special equipment.

Plaintiff has in the past under its existing authority hauled aluminum billets and ingots weighing from 6 to 50 pounds each, wrapped in bundles on pallets of an average weight of 2000 pounds each. When its authority to do this was questioned by a representative of the Interstate Commerce Commission, it filed an application with the Commission to obtain either (1) a declaration of its right to transport such commodities, or (2) an extension of its authority to permit it to transport such commodities within its existing territory. The hearing examiner concluded that the existing authority authorized such transportation and recommended that the application be dismissed in accordance with the Motion of the applicant. The hearing examiner's recommended report concluded that the plaintiff was authorized by its heavy hauler's certificate to transport all of the considered commodities and that therefore the application for the new authority be dismissed.

The Commission agreed with and adopted the examiner's statement of facts, but disagreed with his interpretation of the plaintiff's certificate, and further found that the application for authority to transport the commodities in question should be denied for the reason that the facts of record did not show that such service was required by the public convenience and necessity.

Plaintiff accepts the findings of fact of the Commission, but contends that its ultimate conclusion is erroneous and unreasonable. Plaintiff's argument is that the Commission's determination is contrary to the evidence that the inherent nature of the commodities requires aggregation, bundling and special packaging so that when the commodity is tendered to the applicant it is of such size and weight as to be within the scope of plaintiff's existing authority.

The Commission applied a doctrine which has been set forth in W. J. Dillner Transfer Co.—Investigation of Operations, reported in 79 M.C.C. 35, affirmed by this court in W. J. Dillner Transfer Co. v. Interstate Commerce Commission, 193 F.Supp. 823 (W.D. of Pa., 1961), aff'd per curiam 368 U.S. 6, 82 S.Ct. 16, 7 L.Ed.2d 16 (1961).

The Commission's interpretation of its standards as set forth in the *Dillner* case, 79 M.C.C. at 358, is:

"In bundling, aggregating, or palletizing, it should be the general rule of construction (1) that the individual 'commodity itself' is the controlling consideration as respects a carrier's authority; (2) that the limited exception which the *Black* case, 64 M.C.C. 443, represents, where commodities are bundled for protection or as otherwise required by their 'inherent nature,' must be maintained within its strictest limits; (3) that the minimum bundle which is required by the 'inherent nature' of the commodity is the size or type of bundle which must be considered in any determination whether necessity exists for the use of special equipment; and (4) that in order reasonably to maintain these limits it shall be presumed, in the ab-

sence of a sound basis for concluding to the contrary, that commodities tendered to carrier, in bundles or aggregations, are within the general rule and not within the limited exception thereto; * * * ".

The hearing examiner's statement of facts which was adopted by the Commission included the following:

(1) The ingots are produced in individual units in sizes from 6 to 50 pounds each.

(2) The shipper segregates its products according to their chemical composition in order to control the impurities and the various alloying constituents therein.

(3) It is necessary that the particular composition be readily ascertainable by both shipper and consignee as different compositions are required to meet the particular needs of various customers.

(4) The ingots are segregated and assembled in stacks on billets weighing an average of 2000 each in accordance with their different chemical composition.

(5) The aluminum ingots and billets are soft and easily abraded, and if shipped individually, would have to be separately wrapped or placed in a container to prevent injury.

(6) The ingots are packed in bundles, on pallets or skids, and each assembled bundle is wrapped in polyethylene bags for protection against caustic atmospheric conditions in the neighborhood of shipper's plant.

(7) The shipper always tenders the commodity to the carrier so assembled, palletized and wrapped.

(8) When so palletized the commodities are too heavy to be handled without the use of special equipment.

(9) Customers will not accept aluminum ingots and billets loose because of the difficulty and additional handling involved in sorting and stacking the individual pieces, and because of the difficulties in determining the chemical composition of the individual ingots.

(10) Individual packaging or handling of the ingots and billets separately would be inconvenient, expensive, cumbersome and not acceptable to the customer.

The Commission's ultimate determination, after the acceptance of the facts as found above, is based on its conclusion that the ingots are susceptible, if shipped individually, of being loaded or unloaded manually and that there was nothing indicating that they cannot be wrapped either individually or in smaller lots than those which would require special equipment for their handling.

The Commission in this case recognized that the commodities herein involved are aggregated and packaged by the shipper so as to require the use of special equipment for their transportation. The aggregation is done for the purpose of segregating billets of different chemical combination as well as for economy and efficiency. The wrapping of the palletized assemblies of ingots is done for their protection against caustic atmospheric conditions. It is the standard practice of this shipper that these commodities are always tendered in such form and it was established that customers will only accept delivery in such palletized aggregate package form. The Commission's determination, in attempting to apply the *Dillner* rule to these commodities, is based on a conclusion that it would be physically possible to load the aluminum billets and ingots individually and manually and to wrap them individually or in small packages which would not require the use of the special equipment.

The Commission's determination is entirely theoretical. It was not shown by the evidence that these commodities are ever manually loaded or separately packaged. In the *Dillner* case (cit. supra) the Commission applied a formula which

uses the "inherent nature" of the commodity as a standard to determine whether the rights of carriers under heavy hauler's certificate cover a commodity when assembled, packaged, or palletized. *Dillner* dealt with various types of steel and with fire brick. For. motor carriers these were all palletized but the record in *Dillner* showed that these commodities had previously been actually shipped loose, both by motor carrier and by rail. It could, therefore, be reasonably and logically concluded that there was nothing in the "inherent nature" of the commodity that required it to be shipped by shippers with special handling equipment. *Dillner*, however, was a further refinement of a rule set forth in *Black*—Investigation of Operations, 64 M.C.C. 443 (1955), which *Dillner* states to be a limited exception to be maintained within its strictest limits. The Commission in *Black* distinguished between commodities aggregated because of their inherent nature, and those aggregated for the sake of efficiency and convenience. In *Black* the Commission was principally involved with large flat thin sheets of steel and aluminum, which were bundled or palletized by the shipper because of the handling difficulty which they presented by reason of their thin gauge and the likelihood of damage when handled individually. There the Commission found that the inherent nature of the commodity required it to be bundled for protection. *Dillner*, in reaffirming the *Black* rule, required that it be kept within strict limits so that the carrier would have the burden of establishing a sound basis for coming within the rule. The District Court in affirming *Dillner* recited the evidence showing that the commodities in question, steel and fire brick, not only could be but were in fact hauled unpalletized and that convenience and saving labor and cost were the main consideration in palletizing the commodity;

(193 F.Supp. p. 827). "Sufficient evidence was present to allow reasonable men to find that this commodity (fire brick) did not through its inherent characteristics demand that it be hauled only *after* it was placed on pallets. (emphasis in original). . . . The test is not whether on this issue this Court agrees with the majority or the minority view of the Commission. It is simply whether the majority view was based on substantial evidence. We find it to be properly supported."

In the present case we fail to find the evidence upon which the Commission relied in refusing to apply the *Black* exception to the commodities in question here. The evidence to support the *Black* rule is substantial; the inherent nature of the commodities which required aggregation and palletization here were the varying chemical compositions and alloys of the aluminum ingots involved, which required separation; the soft, fragile and easily abraded quality of individual ingots which required palletizing; the wrapping of the palletized packages to protect them from the corrosive atmosphere in the neighborhood of the shipper's plant; the refusal of customers to accept aluminum ingots and billets loose; and the inconvenience and expense of crating or packaging each individual ingot and billet separately in a form not acceptable to the customer.

In arriving at its determination the Commission relies upon the possibility that these small aluminum ingots could be loaded manually. But there is no evidence in this record that they were ever so handled. The record shows that they were always assembled and proffered by the shipper assembled and loaded in pallets, wrapped for protection, and that they will not be accepted by the customer except palletized and segregated according to chemical composition. Applying the rule of *Dillner* to the instant case would in effect destroy the exception of the *Black* case which the Commission expressly recognized. It could also be said in the *Black* case that the individual sheets of steel or aluminum could possibly be loaded manually, in fact the individual sheets of steel are at some stage handled individually in

being stacked into bundles and bound together before loading, and it is probable that they could also be so assembled manually upon the bed of a flat bed trailer in loading.

We feel that in adopting a standard which uses the possibility that the ingots could be individually and manually loaded, the Commission has gone beyond the bounds of reasonable practicality. It has failed to apply the rule set forth in *Dillner* that:

"it shall be presumed, in the absence of a sound basis for concluding to the contrary, that commodities tendered to carrier, in bundles or aggregations, are within the general rule and not within the limited exception thereto; . . ." (79 M.C.C. at page 358).

As recently as December 16, 1965, the Commission in Aetna Freight Lines, Inc. —Investigation of Operation, Docket No. MC–C–4050, reported in 100 M.C.C. 96, recognized the necessity of reasonableness in the application of the *Black* rule:

"While the individual steel sheets are not so heavy that they could not be handled manually, it has been recognized that single sheets having similar dimension are subject to damage and awkward, if not impossible, to handle, and, therefore, the inherent nature of such commodity requires that they be bundled." (at p. 96)

If the bare physical possibility that a commodity could be individually and manually loaded were to be adopted as the standard for determining the "inherent nature" we see no room for any further application of the *Black* rule. We can see few, if any commodities, which are customarily offered to carriers bundled or palletized which would not be susceptible of being loaded individually if we disregard the economy, efficiency and practical necessity of bundling or palletizing. We must ignore the necessities of the shipper and the requirements and demands of the customers to reach such a result. To adopt such a standard in face of all the evidence to the contrary and based solely upon a conclusion that it is physically possible to handle these items individually, seems to us as reliance solely on a presumption, in face of uncontradicted evidence showing a sound basis for concluding to the contrary.

■ We are mindful of the limited function of this Court in reviewing the orders of the Interstate Commerce Commission. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946). "The Commission is the expert in the field of transportation. And its judgment is entitled to great deference because of its familiarity with the conditions in the industry which it regulates." East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L. Ed. 917. Nevertheless, the agency must make findings that support its decision and those findings must be supported by substantial evidence. I.C.C. v. J–T Transport Company, 368 U.S. 81, 93, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L. Ed.2d 207 (1962).

In arriving at its conclusion we feel that the Commission has ignored substantial evidence to the contrary, and has made a determination that has no evidentiary basis other than a presumption. We, therefore, conclude that the Commission's determination that these commodities are not within the existing authority of the carrier is not based upon the substantial evidence required to support its findings. The order of the Commission will be set aside.