STATE of Texas, Appellant,

v.

**E. A. HOLDER, INC., Appellee.**

**No. 5087.**

Court of Civil Appeals of Texas, Eastland.

Dec. 8, 1977.

Rehearing Denied Dec. 29, 1977.

---

Joyce Beasley, Asst. Atty. Gen., Austin, for appellant.

Aubrey Roberts, Jr., Mays, Moore, Dickson & Roberts, Inc., Sweetwater, Lloyd Scurlock, Sayers, Scurlock, Binion & Brackett, Fort Worth, for appellee.

WALTER, Justice.

This is a suit to determine the scope of authority of Specialized Motor Carrier Certificate, No. 5984, issued to E. A. Holder, Inc., by the Texas Railroad Commission. The suit was instituted by the State of Texas against Holder at the request of the License and Weight Division of the Texas Department of Public Safety.

The State contends Holder was not authorized by its Specialized Motor Carrier Certificate, No. 5984, to transport gypsum wallboard and sheathing for hire; therefore, being in violation of the Motor Carrier Act, Tex.Rev.Civ.Stat.Ann. art. 911b. The trial court disagreed and we affirm the trial court's decision.

Holder was hired by National Gypsum Company, a manufacturer, to transport gypsum material to different points in Texas. Once manufactured, National placed the wallboard and sheathing on pallets or skids of varying sizes depending upon the order instructions of the consignee. In servicing its account with National, Holder transported the material on flatbed tractor-trailer trucks. A forklift was used in loading and unloading the product.

The issue before this court is the construction of terms used in Holder's Specialized Motor Carrier Certificate. In pertinent part, Holder's certificate authorizes the transportation of "heavy bridge timbers, steel and heavy building materials used in the construction of bridges and the framework of buildings . . ." We must determine whether the gypsum wallboard and sheathing are "heavy building materials" and if these materials are used in the "framework of buildings."

The Texas Motor Carrier Act, Tex.Rev. Civ.Stat.Ann. art. 911b, was amended in 1941 to provide for the granting of specialized motor carrier certificates authorizing the transportation of property requiring the use of specialized equipment in the transportation and handling thereof. The Act in part states:

"Property requiring specialized equipment is limited to . . . (4) commodities which by reason of length, width,

weight, height, size or other physical characteristics require the use of special devices, facilities or equipment for their loading, unloading and transportation."

The general rule for construing the authority of a motor carrier's certificate was established in *W. J. Dillner Transfer Co.*, 79 M.C.C. 335 (1959), aff'd., *W. J. Dillner Transfer Co. v. I. C. C.*, 193 F.Supp. 823 (W.D.Pa.1961), aff'd. mem.; *W. J. Dillner Transfer Co. v. United States*, 368 U.S. 6, 82 S.Ct. 16, 7 L.Ed.2d 16 (1961).

Under its certificate, Dillner was authorized to engage in the transportation of "heavy machinery and such commodities which because of their weight and size require special equipment." The Interstate Commerce Commission used the "inherent nature" of the commodity as a standard to determine whether the rights of carriers under a heavy hauler's certificate include a commodity when bundled, packaged or palletized.

In finding Dillner lacked authority to transport certain bundled articles of iron and steel and palletized firebrick, the Commission stated:

"In bundling, aggregating or palletizing, it should be the general rule of construction (1) that the individual 'commodity itself' is the controlling consideration as respects a carrier's authority; (2) that the limited exception which the *Black* case, 64 M.C.C. 443, represents, where commodities are bundled for protection or as otherwise required by their 'inherent nature', must be maintained within its strictest limits; (3) that the minimum bundle which is required by the 'inherent nature' of the commodity is the size or type of bundle which must be considered in any determination whether necessity exists for the use of special equipment; and (4) that in order reasonably to maintain these limits it shall be presumed, in absence of sound basis for concluding to the contrary, that commodities tendered to carrier, in bundles or aggregations, are within the general rule and not within the limited exception thereto."

This general rule and exception were recognized by the Supreme Court of Texas in *State v. Bilbo*, 392 S.W.2d 121 (Tex.1965). Bilbo's limited common motor carrier's certificate authorized the transportation of "heavy building materials, machinery and supplies between all points in Texas". The commodities transported by Bilbo consisted in part of asphalt shingles on 2,000-lb. pallets, rolls of asphalt siding on 2,000-lb. pallets and bundles of asbestos shingles on 2,000-lb. pallets. The court ruled Bilbo was not authorized to transport the commodities under his certificate because there had been no showing that palletization of the materials was required for their protection or as otherwise required by their inherent nature.

The inherent nature exception to the general rule established in *Dillner* is found in *R. Q. Black*, 64 M.C.C. 443 (1955). The application of this exception requires close examination of the commodities in question.

In *Black*, the investigation concerned, in part, pieces of aluminum sheet metal. The individual sheets of steel were 100 inches long and either 20 or 48 inches wide. The sheets were loaded on pallets and bound, 100 sheets to the pallet, by steel bands. Loading and unloading was done by crane and in some instances by heavy duty fork-lift trucks. The sheet metal was sold in such bundles. This was the "customary method of handling by the manufacturer". *Black*, at 445. The Interstate Commerce Commission determined that bundling was required by the inherent nature of the commodity and sustained the carrier's authority to transport the sheet metal. The Commission said:

"Single sheets are unstable, subject to bending or other damages, and, having in mind their size, awkward or impossible to handle without bundling."

We hold the same considerations apply to the handling and transportation of gypsum wallboard and sheathing, thereby satisfying the inherent nature test.

The gypsum material in the instant case was loaded on pallets, twenty (20) to one hundred (100) pieces to the pallet, depending upon the customer's order instructions.

The most common palletized unit ordered was fifty (50) pieces. The weight of each pallet ranged from 1,700 pounds to 3,000 pounds, requiring a forklift for loading and unloading. The material was four (4) feet wide and either eight (8) or twelve (12) feet long.

■ The evidence shows that two pieces of the gypsum wallboard is the "limit" of what two people can carry "without knocking all of the corners off of it". We hold the inherent nature of the commodity requires it to be palletized to protect it from being damaged. As palletized, it is necessary to load and unload the gypsum material using special equipment. A forklift qualifies as special equipment "so long as the commodity itself is otherwise authorized". *State v. Bilbo*, 392 S.W.2d 121 (Tex.1965).

Once the inherent nature of the commodity is established, requiring aggregation on pallets, additional factors may be considered to determine the authority of the heavy hauler's certificate. Factors such as (1) the economy and efficiency of placing the commodity on pallets is to be taken into account in determining the minimum size bundle required; (2) the commodities basic characteristics; and, (3) the industry-wide practices with regard to handling the commodity. *Ace Doran Hauling and Rigging Co., Investigation of Operations*, 108 M.C.C. 717 (1969).

Two pieces of the gypsum material are placed together face-to-face, bound by strips of paper for protection. The State argues this is the "minimum bundle" capable of being manually "handled on the construction site," therefore, not qualifying as heavy building material. Additional findings of fact were requested by the State on this point. This request was refused.

The "minimum bundle" requirement expressed in *Dillner* refers to the minimum bundle necessary to protect the commodity from damage, or otherwise required by its inherent nature for transportation. The *Dillner* case was not referring to the minimum bundle capable of being handled on the construction site. Therefore, we hold the trial court did not err in refusing

make the additional findings of fact as requested.

Since the Texas Supreme Court's decision in *State v. Bilbo*, 392 S.W.2d 121 (Tex.1965), courts have expanded the "inherent nature" exception. These cases recognize the "physical possibility" of manually handling the commodity in question but conclude the adoption of such a standard goes beyond the bounds of "reasonable practicality". *Aero Trucking, Inc. v. United States*, 346 F.Supp. 826 (W.D.Pa.1966). *Moss Trucking Co. Inc., Investigation of Operations*, 103 M.C.C. 91 (1966). The court in *Aero* further stated:

> "If the bare physical possibility that a commodity could be individually and manually loaded were to be adopted as the standard for determining the 'inherent nature' we see no room for any further application of the *Black* rule. We can see few, if any, commodities which are customarily offered to carriers bundled or palletized which would not be susceptible of being loaded individually if we disregard the economy, efficiency and practical necessity of bundling or palletizing."

■ We hold the bundled or palletized gypsum material qualifies as "heavy building material".

The State further contends:

> ". . . The Trial Court erred as a matter of law when it construed the term 'used in the construction of . . . the framework of buildings,' in E. A. Holder, Inc.'s Specialized Motor Carrier Certificate No. 5984 as including the application of gypsum wallboard and sheathing."

The evidence shows that residential construction contractors are paid at three different stages in constructing buildings. The first payment comes after the foundation has been laid, the second payment comes after the "framing stage" and the third payment at completion of the building. Nathan Armstrong, a building contractor, gave testimony pertaining to the gypsum wallboard and sheathing as being part of the framework of buildings:

"Q So when the sheetrock—you call that the framing stage. And when that has been completed you are paid?

A They call it 'Dried in stage.' Yes, sir.

Q And it is the framing?

A Yes, sir. No interior finish.

Q No interior finish whatsoever. You are talking about framing of the structure?

A Yes, sir."

The operations manager for E. A. Holder, James Wadlington, produced additional evidence showing the gypsum material is used in the framework of buildings. Wadlington testified substantially as follows:

The second stage of construction of a building is considered the framing stage. During this framing stage the gypsum wallboard and sheathing will be directly applied to the framing studs.

We overrule the State's point of error. *Martinez v. Delta Brands, Inc.*, 515 S.W.2d 263 (Tex.1974).

█ The State argues in its last point of error that the judgment of the trial court is against the great weight and preponderance of the evidence. We have considered the entire record and find the trial court's judgment was not against the great weight and preponderance of the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

We have considered all of appellant's points of error and find no merit in them. They are overruled.

The judgment of the trial court is affirmed.