VITAPRO FOODS, INC., Appellant,

v.

STATE of Texas ex rel. DEPARTMENT OF CRIMINAL JUSTICE, Appellee.

No. 06–96–00089–CV.

Court of Appeals of Texas, Texarkana.

April 16, 1998.

Rehearing Overruled May 19, 1998.

---

**28.** *In Interest of B.R.,* 950 S.W.2d at 121.

P. Michael Jung, Strasburger & Price, Dallas, for appellant.

Julia Lacy Armstrong, Asst. Atty. Gen., Austin, for appellee.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

GRANT, Justice.

VitaPro Foods, Inc. (VitaPro) appeals a summary judgment declaring its contracts with the Texas Department of Criminal Justice (TDCJ) invalid. VitaPro brings two points of error, contending that the trial court erred by granting TDCJ's motion for summary judgment and denying VitaPro's motion for summary judgment.

This case concerns the authority of the TDCJ to enter into two contracts with Vita-Pro. VitaPro is a Canadian company that manufactures a soy-based meat substitute called VitaPro, which is a textured vegetable protein (TVP).

In January 1994, Yank Barry, VitaPro's President and CEO, met TDCJ officials at the American Correctional Association Food Show and Service Show in Orlando, Florida. According to Barry, a VitaPro broker followed up on this initial contact during several subsequent meetings with TDCJ officials.

According to Jane Thomas, TDCJ's Director of Food Service, James Collins, TDCJ's Executive Director, directed her to purchase VitaPro for testing purposes in mid–1994. Thomas prepared a bid specification and sent it to the General Services Commission (GSC). Through the GSC, TDCJ acquired some VitaPro in July 1994. According to Barry, after the testing period, he met with officials of TDCJ and Texas Correctional Industries (TCI), a TDCJ office that uses inmate labor to make products. At this meeting, the parties discussed the possibility that TCI could repackage and market Vita-Pro. In the succeeding months, TCI officials met with VitaPro representatives in Montreal and developed an "Action Plan" in order to "[f]acilitate the purchase of TVP from Vita-Pro Foods, Inc. for distribution by TCI to Food Service and to other tax supported entities."

On November 7, 1994, Collins issued a "Decision Memorandum" stating that "[i]t is the intent of the Prison Industries Office, Texas Correctional Industries, to purchase Dehydrated Textured Protein Product (TVP) in bulk quantities, and using inmate labor, repackage and label said product in commercial containers for sale to the TDCJ–ID Food Service Facilities and to the correctional facilities of other states." At the same time, TDCJ entered into the first of two contracts to purchase VitaPro, without contracting through the GSC. The parties agree that the contracts between TDCJ and VitaPro are embodied in two "Delegated Purchase Orders."

The first contract provided for a term ending on August 31, 1995, with an option to

renew the contract for four additional one-year terms. The contract obligated TDCJ to purchase a minimum of seventeen metric tons of VitaPro per month. The contract alluded to TCI's role as a distributor by providing that VitaPro would "[p]rovide Texas Correctional Industries (TCI) technical assistance in areas such as product packaging and inventory control."

TDCJ and VitaPro entered into a second contract in July 1995. This contract had a five-year term and obligated TDCJ to purchase a minimum of thirty-nine metric tons of VitaPro per month. TDCJ retained the right to cancel for cause, which was defined as "serious detriment to the daily operations of TDCJ–ID." The second contract also noted that VitaPro would provide TCI technical assistance with product packaging and inventory control. The contract provided for an estimated purchase of VitaPro at a cost of over $33 million.

Although the purported contracts do not directly provide for TCI's role as a distributor of VitaPro, the evidence is undisputed that all VitaPro shipments went first to TCI, and not to TDCJ's Food Services Division. According to Thomas, Food Services purchased VitaPro from TCI with appropriated money actually spent, as opposed to paper-only transfer of funds between agencies.

Additionally, TCI, with the help of Food Services employees, began to market VitaPro to other government entities. According to Artis B. Mosley, Jr., a TDCJ deputy executive director, TCI purchased VitaPro out of the Industrial Revolving Fund. It was Mosley's understanding that the Industrial Revolving Fund consists of money from sales. TCI repackaged the VitaPro, then marketed it. The parties agree that TCI completed only five sales to entities other than TDCJ: State of New York, State of Iowa, State of Missouri, Nacogdoches County, and McLennan County. These sales totaled $84,719.11:

| | |
|---|---|
| New York | $66,728.21 |
| Iowa | $13,005,00 |
| Missouri | $ 2,906.25 |
| Nacogdoches County | $ 1,806.25 |
| McLennan County | $ 273.00 |

TDCJ and VitaPro encountered many obstacles to TCI's plan to repackage and ship VitaPro. Many states have laws discouraging the purchase of food handled by inmates. Additionally, TCI could not effectively negotiate for favorable trucking costs. Finally, because of geographical proximity, VitaPro could ship to northern and eastern states more cheaply than could TCI. Therefore, VitaPro directly shipped the New York and Iowa orders from Canada. For these sales, TCI essentially received a sales commission without ever touching the product.

Barry conceded that the distributorship agreement may never have been committed to writing. He also conceded that TCI's required minimum purchase was intended to cover sales to TDCJ.

Thomas testified that Collins ordered her to serve VitaPro every day to inmates. Eventually, Food Services was serving Vita-Pro twenty-six times a month. TDCJ presented considerable summary judgment proof that the frequent serving of VitaPro demoralized both inmates and staff. The inmates complained of adverse health effects, primarily rampant flatulence. Far fewer inmates and staff ate meals when VitaPro was served.

On February 20, 1996, TDCJ stopped accepting, phased out the consumption of, and filed suit against VitaPro. In its suit, TDCJ requested the court to declare that

(1) No contract was ever formed between TDCJ or the State of Texas, and Vita-Pro;

(2) Neither the Purchase Order nor any of its predecessors confer any obligation upon TDCJ or the State of Texas to take or to pay for any amount of Vita-Pro product;

(3) TDCJ has paid in full for all the Vita-Pro product shipped and received through the month of January 1996;

(4) TDCJ has rightfully rejected the February 1996 shipment of VitaPro and has performed all legal duties to Vita-Pro with respect to the rejected goods;

(5) TDCJ is now and at all times relevant was without authority to expend the funds used to pay VitaPro for the goods shipped.

Alternatively, TDCJ requested the court to declare that it had rightfully canceled the contract for cause. As a final alternative, TDCJ requested equitable rescission.

VitaPro counterclaimed, seeking a declaration that the contract was valid, that it was due breach-of-contract damages, and that TDCJ had not properly canceled the contract for cause.

On July 12, 1996, TDCJ filed a motion for summary judgment, seeking an order declaring that

(a) Other than by Purchase Order No. 696–4–5847–X [the original order placed by GSC], no contract was ever formed between TDCJ or the State of Texas, and Defendant;

(b) Other than Purchase Order No. 696–4–5847–X, which has been fully performed by both parties, no Purchase Order issued by Plaintiff to Defendant confers any obligation upon TDCJ or the State of Texas to take or to pay for any amount of VitaPro product;

(c) TDCJ is now and at all times relevant was without authority to expend the funds used to pay VitaPro for the goods shipped under [the last two contracts].

VitaPro filed a counter-motion for summary judgment on July 19, 1996. VitaPro sought summary judgment against TDCJ on TDCJ's claims that the contracts were invalid or canceled for cause. VitaPro also sought a declaration that all the contracts were valid, and that VitaPro was entitled to breach-of-contract damages.

On August 9, 1996, the trial court entered an order denying VitaPro's motion for summary judgment and declaring that the disputed contracts were not valid, that TDCJ had no obligation to VitaPro, and that TDCJ was without authority to pay VitaPro for the goods shipped under the second and third contracts.

Summary judgment is appropriate if the summary judgment evidence "on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response." [1] When deciding whether a disputed issue of material fact precludes summary judgment, an appellate court views all of the evidence in the light most favorable to the nonmovant and resolves all doubts in its favor.[2]

■■■ No one has authority to make a contract binding on the State, except where he is authorized to do so by the Constitution or a pre-existing statute.[3] Additionally, the Legislature shall not grant, by appropriation or otherwise, any amount of money out of the Treasury of the State, to any individual, on a claim, real or pretended, when such action has not been provided for by pre-existing law.[4] Even if an individual has apparent authority to act, he cannot bind the State without actual authority. As the powers of all State officers are fixed by law, all persons dealing with them are charged with notice of the limits of their authority and are required to determine whether the contemplated contract is within the power conferred.[5] "There is no occasion or excuse in such a case for indulging in presumptions or in relying on appearances." [6] Therefore, the VitaPro contracts are not enforceable unless TDCJ had the authority to enter into them.

The GSC is generally responsible for all state purchases.[7] Specifically, Section 2155.061(a) provides that "[t]he commission shall acquire by purchase, lease, rental, or

1. Tex.R. Civ. P. 166a(c).

2. Nixon v. Mr. Property Management, 690 S.W.2d 546, 548–49 (Tex.1985).

3. State v. Ragland Clinic–Hosp., 138 Tex. 393, 159 S.W.2d 105, 106 (1942).

4. Tex. Const. art. III, § 44.

5. Ragland, 159 S.W.2d at 107; City of Bonham v. Southwest Sanitation, Inc., 871 S.W.2d 765, 767 (Tex.App.—Texarkana 1994, writ denied).

6. Id.

7. Tex. Gov't Code Ann. § 2155.061(a) (Vernon 1998).

another manner all goods and services for a state agency, including a purchase that does not require a competitive bid or a spot purchase." [8] The disputed VitaPro purchases were not made through the GSC. However, VitaPro argues that several other statutes conferred authority on TDCJ to make the purchases.

VitaPro argues that the statutes establishing the prison industries program authorize the VitaPro purchases.[9] VitaPro notes that one of TCI's functions is to sell products to state agencies. VitaPro argues that the repackaging of VitaPro gave opportunities to inmates to engage in productive labor. The statute creating TCI provides that "[t]o encourage the development and expansion of the prison industries program, the prison industries office may enter into necessary contracts related to the prison industries program." [10]

The Government Code provides for the purchase of materials for the prison industries program:

> To provide articles and products to an agency of the state or a political subdivision of the state, the institutional division may purchase equipment, raw materials, and supplies *in the manner provided by law.*[11]

(Emphasis added.) This statute permits TDCJ to obtain materials for products for political subdivisions of the State of Texas.

Except for the three sales to other states, all of the repackaged VitaPro was sold to counties, which are subdivisions of the state, and to TDCJ for prisoner consumption. One of the purposes of the prison industries programs is to "provide adequate, regular, and suitable employment for the vocational training and rehabilitation of inmates, consistent with proper penal purposes." [12] TDCJ has limited authority to sell items that it has produced to other governments.[13]

■ The State also contends that the sales to other states violated Section 1761 of the criminal laws of the United States Code, which prohibited transporting goods manufactured by convicts or prisoners into interstate commerce.[14] A contract which is made in violation of a statute is illegal and void.[15] If a contract was entered into which required a violation of federal law, then such an agreement would be void. However, subsection (b) of Section 1761 provides in pertinent part that this chapter shall not apply to agricultural commodities manufactured in a state institution for use of a state or any political subdivision of the State. Thus, if these contracts apply to agricultural commodities, they did not violate any federal criminal law and are not void.

■ The present litigation does not attempt to void the out-of-state sales, or any of the sales made through the Texas prison

---

**8.** This section became effective on September 1, 1995. It was preceded by Tex.Rev.Civ. Stat. Ann. art. 601b, § 3.01(a) (repealed 1995), which provided that the GSC "shall purchase, lease, rent, or otherwise acquire all supplies, materials, services, and equipment for all state agencies, including spot purchases and purchases that do not require a competitive bid, except for [certain irrelevant exceptions]." Article 601b, § 3.01(a) would apply to VitaPro purchases before September 1, 1995, and § 2155.061(a) of the Government Code would apply to VitaPro purchases on or after September 1, 1995. The differences between the sections have no apparent effect on the outcome of the case. Therefore, for ease of discussion, we will reference only the section still in effect.

**9.** Tex. Gov't Code Ann. §§ 497.001 et seq. (Vernon Supp.1998).

**10.** Tex. Gov't Code Ann. § 497.006 ("Prison Industries Office" is the statutory name for TCI).

**11.** Tex. Gov't Code Ann. § 497.025.

**12.** Tex. Gov't Code Ann. § 497.022(1).

**13.** Article 9007, § 1(a) provides:

> The Texas Department of Corrections is hereby authorized to contract with other states, the federal government, foreign governments, or an agency of any of them for the *manufacturing* and selling of items *produced* by prison industries for the above mentioned governments.

Tex.Rev.Civ. Stat. Ann. art. 9007, § 1(a) (emphasis added) (Act of Feb. 28, 1979, 66th Leg., R.S., ch. 9, § 1, 1979 Tex. Gen. Laws 17, *repealed by* Act of May 28, 1997, 75th Leg., R.S., ch. 1409, § 9, 1997 Tex. Gen. Laws 5284).

**14.** 18 U.S.C.A. § 1761 (West Supp.1998).

**15.** *Mayfield v. Troutman,* 613 S.W.2d 339, 344 (Tex.Civ.App.—Tyler 1981, writ ref'd n.r.e.).

system, but rather is attempting to void the contracts of purchases. The only bearing that the sales might have was to show that the purchases were made for illegal sales. The contract to purchase Vita–Pro by the prison industry program does not mention any out-of-state sales as the purpose of the purchase. There were only three out-of-state sales, that being to the states of New York, Iowa, and Missouri. Without a showing that the parties to the contract intended to make these out-of-state sales at the time of entering into the contracts in questions, this would not void the contracts.

But a salient factor that must be considered in Section 497.025 is that these purchases must be made "in the manner provided by law." To hold that this statute permits direct purchases would be to beg the question. Thus, we must look to the specific authorization provisions to determine what manner is provided by law.

VitaPro urges that the general purchasing commission does not have authority over goods and services for resale, citing Section 2155.141(1) of the Texas Government Code.[16] This statute indicates that the commission's authority does not extend to such purchases, but this statute does not in itself provide such authority for the TDCJ.

VitaPro also contends that TDCJ was authorized to purchase VitaPro pursuant to Section 496.051(b):

> The [TDCJ] board may authorize the executive director to adopt policies allowing the institutional division *to purchase directly or at public auction livestock, agricultural commodities, agricultural or industrial equipment, supplies, and raw materials for agricultural or industrial production, breeding, consumption, or resale,* if the division determines that the purchase is economically feasible and advantageous to the division. The State Purchasing and General Services Act . . .

does not apply to purchases made under this subsection. The institutional division shall notify the General Services Commission as soon as practicable of a purchase made under this subsection and the purchase price.[17]

(Emphasis added.) This statute does not directly authorize any TDCJ purchases. Instead, it authorizes the TDCJ to formulate policies permitting direct purchases that do not go through the GSC.

The State contends that VitaPro is not an agricultural commodity under Article 496.051(b). VitaPro is texturized soybean with an assortment of other items added into the mix, such as spices, wheat, flour, carrots, green beans, onions, yeast, corn syrup, canola oil, corn starch, conditioners, and anti-caking agents.

The State also argues that the phrase *for agricultural or industrial production, breeding, consumption, or resale* uses the adjectives *agricultural* and *industrial* to modify the four nouns coming after those adjectives. The doctrine of the last antecedent is sometimes applied to making an interpretation in this situation. This doctrine is as follows: [18]

> [R]elative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote; nor are they ordinarily to be construed as extending to the following words. This rule is, however, merely an aid to construction to be applied only where there exist uncertainties and ambiguities in the statute, and when other and more important rules of construction fail; and the clear intent of the legislature takes precedence as a cannon of construction.

Applying the doctrine of the last antecedent, agricultural or industrial modifies only

---

**16.** Tex. Gov't Code Ann. § 2155.141(1) (Vernon 1998).

**17.** When the VitaPro purchases were made, Section 496.051(b) had a slightly different wording. The subsection was amended in 1995. Tex. Gov't Code Ann. § 496.051(b), *Amended by* Act of May 25, 1995, 74th Leg., R.S., ch. 321, § 1.025(b),

1995 Tex. Gen. & Spec. Laws 2774, 2780, *repealed by* Act of May 28, 1997, 75th Leg., R.S., ch. 1409, § 9, 1997 Tex. Gen. Laws 5284. The change in wording had no effect on the statute's meaning.

**18.** 82 C.J.S. *Statutes* § 334 (1953) (footnotes omitted).

production. A contrary construction applied to those modifiers would create such unlikely intended terms as *industrial breeding* and *industrial consumption.*

The State emphasizes that the legislative history should be examined to determine the legislative intent. Section 311.023 of the Texas Government Code[19] sets forth seven areas that may be looked at in construing a statute whether or not the statute is considered ambigous on its face. One of these areas is the legislative history. Section 312.005[20] states that the court shall diligently attempt to ascertain legislative intent and shall consider at all times the old law, the problem, and the remedy.

■ On the other hand, the Texas Supreme Court has stated that unless the statute is ambiguous, we must follow the clear language of the statute.[21] The Texas Supreme Court in *Republicbank Dallas v. Interkal, Inc.*[22] stated the following:

Courts must take statutes as they find them. More than that, they should be willing to take them as they find them.

They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language and not elsewhere. . . . They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain.

■ Benjamin Disraeli said, "With words we govern men." The laws are written for the benefit of the people of the State of Texas, and any citizen reading the law should be able to rely on the language of the statute. We should not go behind the statute to ascertain some legislative intent that was in no way expressed in the language. Legislative intent necessarily requires that the legislators who vote on the passage of such a law understand and intend the language as written. There is some ambiguity[23] in the stat-

19. Tex. Gov't Code Ann. § 311.023 (Vernon1988).

20. Tex. Gov't Code Ann. § 312.005 (Vernon 1988).

21. *Republicbank Dallas v. Interkal, Inc.,* 691 S.W.2d 605, 607 (Tex.1985).

22. *Id.* (quoting *Simmons v. Arnim,* 110 Tex. 309, 220 S.W. 66, 70 (1920)); *accord Seay v. Hall,* 677 S.W.2d 19, 25 (Tex.1984).

23. The ambiguity rather is on what modifies what in the lengthy opening sentence. In its brief, VitaPro suggests four different possible constructions of that sentence.

Option # 1:
- livestock,
- agricultural commodities,
- agricultural or industrial equipment,
- supplies, and
- raw materials for agricultural or industrial,
- production,
- breeding,
- consumption, or
- resale

Option # 2:
- livestock,
- agricultural commodities,
- agricultural or industrial equipment,
- supplies, and
- raw materials

for
- agricultural or industrial production,
- breeding,
- consumption, or
- resale

Option # 3:
- livestock,
- agricultural commodities,
- agricultural or industrial equipment,
- supplies, and

ute in question in this case, but we should not look for extraneous matters to be used as a basis for reading into the statute an intention not expressed or intended to be expressed in the language used.[24]

The State has offered considerable legislative history for Section 496.051, some of which suggests that there was discussion in the committee and bill analysis that the legislation was to give the TDCJ the leeway to make advantageous purchases in situations where it was impractical to obtain GSC approval. Earlier versions of the bill limited its application to purchases made at auctions. We recognize that legislative history is one of the factors to be considered according to Section 311.023 of the Government Code.[25] However, this statutory provision is entitled "Statute Construction Aids" and is not designed, nor should it be considered, to engraft substantive provisions onto subsequently enacted legislation when the language, meaning, and interpretation are indisputably clear.[26] While this is how the bill started out initially, this would no longer be binding legislative intent once the bill was amended to also allow direct purchases. The State attempts to limit the effect of this amendment by quoting language from the committee hearing on the House companion bill by the author of the committee amendment, but the plain language of the amendment does not reflect the narrowness which the author expressed at the time he offered the amendment. Thus, when the bill was presented to the entire House and concurred upon by the Senate, the language of the bill as amended was presented to both legislative bodies for a vote.

The State argues that the new statutory authorization is designed only to take effect when it is impractical to requisition through the GSC. It is further pointed out that the first purchase of VitaPro utilized the GSC procedures. The rest of the purchases were made after several months of discussion with VitaPro, and the record does not reflect that the TDCJ could not have purchased the VitaPro through the GSC.

However, there is no language in the statute (Section 496.051(b)) that requires purchases by the TDCJ be made pursuant to that statute *only when* such purchases cannot be made under the GSC. For us to construe such a requirement into the provision would be usurping the authority of the Legislature and in effect be writing the legislation. If the Legislature so intended, then it can insert that language into the statute. Section 496.051 was written after Section 2155.061, which provides for purchases through the GSC. While it is true that this later provision did not amend the specific Act under which the GSC requirements are set up, it should be construed to be an exception, and because it is the latest of the two statutes passed, it should prevail.[27]

- raw material for agricultural or industrial
    - production,
    - breeding,
    - consumption, or
    - resale

*Option # 4:*
- livestock,
- agricultural commodities,
- agricultural or industrial equipment,
- supplies, and
- raw materials for
    - agricultural or industrial production
    - breeding,
    - consumption, or
    - resale

**24.** *Smith v. Brooks,* 825 S.W.2d 208, 211 (Tex. App.—Texarkana 1992, no writ).

**25.** Tex. Gov't Code Ann. § 311.023.

**26.** *Thiel v. Harris County Democratic Executive Committee,* 534 S.W.2d 891, 894 (Tex.1976).

**27.** *See* Tex. Gov't Code Ann. § 311.002 (Vernon 1988).

The language of the statute does not limit the purchase to an auction or a purchase which would require rapid action. It permits a direct purchase on any items listed in the statute if the decision of the agency determines such a sale to be economically feasible and advantageous to the division.

On November 9, 1987, TDCJ formulated a direct purchase policy. The policy was designed "[t]o establish procedures for implementing direct purchases and purchases at public auction for certain agricultural and industrial commodities and materials." It provided that

> In certain instances, it is advantageous for the Texas Department of Corrections (TDC) to make purchases that do not fit the pattern or rules of the State Purchasing and General Services Commission. Examples of these include livestock at auction, used equipment, surplus equipment from correctional facilities in other states, and raw materials for resale items when requested by the customer. The 70th Legislature provided TDC exemption from State Purchasing and General Services Commission rules and review in those instances when the department deems such action is economically feasible and advantageous to the Texas Department of Corrections.[28]

The initial "decision memorandum" authorizing the purchase of VitaPro relied upon TDCJ's purchasing authority under Tex.Rev. Civ. Stat. Ann. art. 6203c–12, a predecessor statute to Section 496.051. The agency's policy memorandum also set up a procedure whereby the divisions of the department could make direct purchases. Subsequent purchase orders and payment vouchers also referenced Article 6203c–12. Therefore, Section 496.051 was TDCJ's statutory justification for the VitaPro purchases. VitaPro notes that "[c]onstruction of a statute by the administrative agency charged with its en-

forcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute."[29] VitaPro argues that we should give great weight to the TDCJ's conclusion that the VitaPro purchase was authorized by Section 496.051.

The statute authorizing the TDCJ board to adopt policies allowing for such purchases and the policy adopted allow this exception to the State purchasing and General Service Commission rules "when the department deems such action is economically feasible and advantageous to the Texas Department of Corrections."[30]

It is not the duty of the person contracting with the TDCJ to decide whether the purchase is economically feasible and advantageous to the Texas Department of Corrections. To require such action would place a difficult, and perhaps impossible, burden on any party attempting to contract under this provision. Under both the statute and policy, the TDCJ is best suited to determine or deem whether a purchase is economically feasible and advantageous. There is no summary judgment proof that the TDCJ did not deem these purchases to be economically feasible and advantageous. Furthermore, if the TDCJ represented to the seller that the purchases were economically feasible and advantageous, then the seller had a right to rely upon those representations.

█ VitaPro argues that its product is a raw material. Raw material can be defined as "crude or processed material that can be converted by manufacture, processing, or combination into a new and useful product. Wheat [the finished product of the farmer] is *raw material* for the flour mill."[31] However, a raw agricultural commodity is usually defined more narrowly. The Texas Health and Safety Code[32] defines it as "any food in its raw or natural state." The Federal Food,

**28.** Texas Department of Corrections, Board Policy No. BP–14.66 (November 9, 1987).

**29.** *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 824 (Tex.1993).

**30.** Texas Department of Corrections, Board Policy No. BP–14.66 (November 9, 1987).

**31.** Webster's Ninth New Collegiate Dictionary 978 (1985).

**32.** Tex. Health & Safety Code Ann. § 431.002 (Vernon 1992 & Supp.1998).

Drug, and Cosmetic Act [33] defines *raw agricultural commodity* as "any food in its raw or natural state, including all fruits that are washed, colored, or otherwise treated in their unpeeled natural form prior to marketing." This section also defines *processed food* as "any food other than a raw agricultural commodity and includes any raw agricultural commodity that has been subject to processing, such as canning, cooking, freezing, dehydration, or milling." We recognize that the term "raw materials" was used in some payment vouchers. TCI inventory documents refer to VitaPro in bulk form as "raw materials" and in repackaged form as "finished goods." We conclude that the processing of VitaPro takes it beyond the stage of being a raw material.

However, if the product fits in another category under the statute, a mistake in the terminology describing the product would not void the contract. The formulated policy itself authorized agricultural commodities. For an ultimate determination of whether these contracts for the purchase of Vitapro were legal under the statute, we must look to the authorization to purchase agricultural commodities.

TDCJ argues that VitaPro cannot be an agricultural commodity because it is already a finished product ready for consumption. It contends that VitaPro is a highly manufactured, complex food product that has come a long way from the farm. The Texas Agricultural Code in Section 41.002 [34] defines an *agricultural commodity* as "an agricultural, horticultural, viticultural, or vegetable product, bees and honey, planting seed, rice, livestock or livestock product, or poultry or poultry product, produced in this state, either in its natural state or processed by the producer." It is also defined in Section 104.002 [35] as a fruit or vegetable that is produced in this state for commercial purchases, whether it is in its natural condition or has been processed.

The original-identity test avoids the generalities of most definitions of this term by giving it a factual focus for definitive classification. The principle of the original-identity test to distinguish between an agricultural commodity and a manufactured product had its origin in the interpretation of the Interstate Commerce Act. Nevertheless, this seems an appropriate test in the present case. In *Hartranft v. Wiegmann,* [36] the United States Supreme Court said that at some point processing and manufacturing will merge. But when the commodity retains a continuing substantial identity through the processing stage, we cannot say that it has been manufactured. United States Supreme Court in *East Texas Motor Freight Lines v. Frozen Food Express* [37] followed this doctrine, stating that

> [m]anufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary.... There must be transformation; a new and different article must emerge, having a distinctive name, character, or use.

We recognize that different courts have made different interpretations under this test. The State points to the cases of *Interstate Commerce Commission v. Schaetzel* [38] and *Frozen Food Express v. United States.* [39] The first case finds nonfat dried milk to be a manufactured product when certain ingredients have been added, and the second case finds fresh meat, cottonseed mill, canned fruits and vegetables, and condensed milk to be manufactured products because they have been combined with other constituents and processed by various machinery. These cases do not appear to follow the continuing substantial identity test set forth by the Supreme Court.

**33.** 21 U.S.C.A. § 321(r) (West 1972).

**34.** Tex. Agric. Code Ann. § 41.002 (Vernon 1995).

**35.** Tex. Agric. Code Ann. § 104.002 (Vernon 1995).

**36.** 121 U.S. 609, 7 S.Ct. 1240, 30 L.Ed. 1012 (1887).

**37.** 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917 (1956).

**38.** 339 F.Supp. 1345 (E.D.Wis.1972).

**39.** 148 F.Supp. 399 (S.D.Tex.1956).

■ The fact that seasoning, preservatives, flavoring, or other products have been added does not always negate the product having a continuing identity. In the present case, the fact that the trade name VitaPro was used did not in and of itself constitute a change in substantial identity. It was still referred to as a "textured vegetable protein product," a "soy-based chicken and beef supplement," a "soya-based-product," a "vegetable soya protein," and such other terms that carried forward the suggestion that soybeans were the basic ingredient. We find that the summary judgment proof raises some evidence to create a fact issue as to whether VitaPro is an agricultural commodity.

At the time this summary judgment was entered, Rule 166a of the Rules of Civil Procedure had not been amended, and the burden was on the State to show as a matter of law that VitaPro did not fit in any of the categories allowing a direct purchase. The State failed to exclude as a matter of law that VitaPro was an agricultural commodity. The fact that VitaPro was used for consumption and resale was not disputed. Therefore, we reverse and remand this case for trial.